John Russell WEBSTER, et al., Plaintiffs-Appellees Cross-Appellants,

v.

The CITY OF HOUSTON, Defendant-Appellant Cross-Appellee.

No. 81–2007.

United States Court of Appeals, Fifth Circuit.

July 9, 1984.

Rehearing En Banc Denied Aug. 9, 1984.

David L. Crawford, James K. Gardner, Timothy James, Houston, Tex., for defendant-appellant cross-appellee.

Harvill & Hardy, Scott A. Sanes, G.P. Hardy, III, Houston, Tex., K. Michael Mayes, Conroe, Tex., for plaintiffs-appellees cross-appellants.

Before CLARK, Chief Judge, BROWN, GOLDBERG, GEE, RUBIN, REAVLEY, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, and HIGGINBOTHAM, Circuit Judges.[*]

PER CURIAM:

We granted rehearing en banc in this case, 711 F.2d 35, to decide whether sufficient evidence exists to support a jury verdict of municipal liability under 42 U.S.C. § 1983. The district court entered judgment against the City of Houston based on a jury finding that the City maintained a custom of using excessive police force. Because the district court excluded evidence and instructed the jury contrary to the standard this court has now adopted to govern municipal liability and our recent decision in *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir.1984) (en banc), we vacate and remand for a new trial under proper evidentiary and instructional standards.

Randy Webster, a seventeen year old Shreveport, Louisiana youth, stole a van from an auto dealership in southeast Houston, Texas by driving it through a showroom window. Almost immediately, members of the Houston Police Department began pursuit. After a dangerous, lengthy, high speed chase, the van was stopped.

When Randy emerged from the van unarmed, Officers Mays and Olin began to hit him and pull his hair. In the scuffle, Officer Mays' pistol discharged. The bullet struck Randy in the head and hand. Randy died as a result of these wounds. A fellow officer provided Mays with a "throw down weapon" to place next to Randy's body to make it appear that he had been armed. All police officers at the scene who later gave statements falsely declared that Randy was armed. The internal investigation of the shooting conducted by the Houston Police Department exonerated the officers, despite the statement of at least one first hand witness, a cab driver, that Randy was unarmed. Only after the youth's parents provoked a federal investigation of the incident over a year later did the true story emerge.

Randy's parents brought suit under 42 U.S.C. § 1983 seeking damages from the City of Houston, the Houston Police Department, and certain named policemen. They sought to prove that the City maintained a custom of using excessive police force that caused Randy's death. The trial judge instructed the jury that they could find the City maintained such a custom "through its highranking officials," whom he defined as "the mayor, city council, the police chief or some similarly ranked official whose acts may fairly be said to represent official policy."[1]

---

[*] Judge Henry A. Politz is recused.

Judge W. Eugene Davis was not a member of the court when this case was submitted to the court en banc and did not participate in this decision.

[1] Pertinent portions of the judge's instructions on municipal liability follow:

In order to find the City of Houston liable for any violation of Randall Allen Webster's constitutional rights, the plaintiffs must establish by a preponderance of the evidence each of the following elements: 1. That the City of Houston through its high ranking officials maintained a custom of depriving citizens of their constitutional right not to be subjected to the use of unreasonable, unnecessary or excessive force through the Houston Police Department. 2. That the conduct of Houston police officers under this custom caused a deprivation of Randall Allen Webster's constitutional rights not to be subjected to the use of unreasonable, unnecessary or excessive force and not to be deprived of his life without due process of law.

In connection with these elements, you are instructed that a city may be held liable for constitutional violations which occur as a result of an official "custom." The custom need not be formally approved by government officials but must be so persistent and well settled that it is reasonable to infer that it represents official policy. For you to find that a custom of unreasonable, unnecessary or excessive force existed in city government, the plaintiffs must establish by a preponderance of the evidence that there existed a regular pattern of such conduct so that it may be inferred that the City of Houston, through its high ranking officials, implicitly authorized or approved such conduct. In this connection, "high ranking officials" means the mayor, city council,

To promote consistency in the adjudication of the rights of injured persons and the inhabitants of municipalities, the court en banc has agreed on the following formulation to govern the imposition of municipal liability:

A municipality is liable under § 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy.

Official policy is:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policymaking authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

 The instructions in this case were prepared without knowledge of this standard and do not comply with it. Nor can the district court's instructions be squared with our recent decision in *Bennett*. To render a city liable actual or constructive knowledge of a "custom" must be attributable to the governing body or officials to whom that body has delegated policy-making authority.

*Bennett* explicated the part of the standard relating to delegation of policy making authority. A "policymaker" must be one who takes the place of the governing body in a designated area of city administration:

City policymakers not only govern conduct; they decide the goals for a particular city function and devise the means of achieving those goals. Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance.

\* \* \* \* \* \*

[T]he delegation of policymaking authority requires more than a showing of mere discretion or decisionmaking authority on the part of the delegee.... The governing body must expressly or impliedly acknowledge that the agent or board acts in lieu of the governing body to set goals and to structure and design the area of the delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent or board.

*Bennett,* 728 F.2d at 769.

The trial court's instructions are much too lax to meet our new standard. The jury should have been instructed to find whether the city council had expressly or impliedly acknowledged that the mayor or the chief of police could act in their stead to set goals and to structure and design the activities of the Houston Police Department.

The court further erred in allowing the jury to consider whether "some similarly

the police chief or some similarly ranked official whose acts may fairly be said to represent official policy.

... A governmental body may be held liable for a pervasive pattern of constitutional abuses by its employees if the entity's inaction or ineptitude in supervising those employees is so great that it evidences deliberate and conscious indifference to a substantial probability that constitutional violations will result. In such a case the pattern of misconduct sug-

gests the inference that the governmental body acquiesced in and implicitly authorized such violations.

You have heard evidence concerning "throw down guns." While the use of a thrown down gun or other means of covering up the true facts of an event does not amount to a violation of a constitutional right under the facts of this case, it may be evidence that unreasonable, unnecessary or excessive force was used.

ranked official" maintained a custom of using excessive force that overrode city policy. In the fact context of this case, the only "officials" involved were the mayor and city council on the one hand and, on the other, the Chief and a number of lesser officers of the Houston Police Department. There was no proof in this record whatsoever that any police officer subordinate to the Chief even possibly could have occupied the role of a city policymaker. Allowing the jury to speculate whether "other officers" could be policymakers was reversible error. It also hazards a violation of the prohibition against fixing municipal liability on the basis of respondeat superior.

■ Even though the trial court's instructions also told the jury that if a practice by city employees was "persistent and well-settled" or "regular", it could be inferred that city policymakers had authorized or approved such conduct, the court refused to permit plaintiffs to offer proof of other claimed instances of the use of excessive force by Houston police. Under our standard this case turns on whether the City maintained a practice of allowing the use of excessive police force that was "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." If actions of city employees are to be used to prove a custom for which the municipality is liable, those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees. The trier of fact must be able to charge the governing body with actual or constructive knowledge of such actions of subordinates. There was no proof of actual knowledge here. "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that

they were the subject of prolonged public discussion or of a high degree of publicity." *Bennett*, 728 F.2d at 768. The judge erred in refusing to allow plaintiffs to attempt to prove other similar incidents of the use and toleration of excessive force by city policymakers in meeting the burden of showing that the custom asserted was "persistent," "widespread," "common," and "well settled."

Because of these errors, this case must be retried under the standard now established both for allowing proof of and for determining the existence of municipal custom.

VACATED AND REMANDED.

JERRE S. WILLIAMS, Circuit Judge, with whom JOHN R. BROWN, GOLDBERG, TATE and JOHNSON, Circuit Judges, join, dissenting.

In dissenting we feel it is of critical importance to spell out the full nature of this case and the law which should govern its holding.

Plaintiffs brought suit under 42 U.S.C. § 1983 with pendent state claims, individually and as representatives of their deceased son who had been shot and killed by a police officer. The suit was for damages and was brought against the City of Houston, (City), the Houston Police Department, (HPD), and certain named policemen. The only issue which is before this Court on appeal is the validity of the judgment the District Court entered against the City based on a jury finding of liability. A panel of this Court affirmed that judgment. *Webster v. City of Houston*, 689 F.2d 1220 (5th Cir.1982). Rehearing en banc was granted on the issue of whether there was sufficient evidence to support the finding.

I. *The Episode*

This case involves a shockingly heinous episode of police misconduct. Randall Allen Webster, 17 years old, stole a van from a Dodge dealership in southeast Houston, Texas, in the early morning of February 8, 1977. In a matter of minutes, Houston police officer Mays spotted the van and

gave chase. Fellow officers Holloway and Olin, responding to Mays' radioed calls, joined in. The chase ended when Webster lost control of the van turning a corner, and it spun to a stop. The police officers left their patrol cars, ran up to the van, and ordered Webster out. Webster emerged from the van and was pushed or thrown to the ground by Mays and Olin. He had no gun and put up no resistance. Mays shot Webster once in the back of the head. The bullet passed through his head and inflicted a wound in his right hand.

Webster lay mortally wounded for some minutes where he had fallen. Other Houston police officers arrived. None of them attempted any care or first aid for the victim, who did not die until later that night while being transferred from one hospital to another. At the scene of the shooting, a plan to conceal the circumstances of the shooting was formulated. After some discussion the group of officers decided that to protect their fellow officer a weapon should be placed at Webster's side. Officer Byrd, among others, offered his "throw down"—an unregistered gun he carried in his patrol car.[1] Someone laid the unloaded pistol next to Webster as he lay moribund at the scene.

Two additional police officers investigating for the Houston Police Department arrived shortly thereafter. They viewed their authority as limited to investigating the "scene." They did not interview any officer involved in the shooting nor any witnesses to it. They did not hear any comments contradicting the apparently justified incident. Initially, the story of the officers at the scene was that Webster had emerged from the van with a gun and had been shot in the struggle to subdue him. Officially, Olin and Holloway reported that Mays shot Webster as soon as the armed

youth exited the van. Although several HPD patrolmen saw no gun when they arrived shortly after the shooting, not one officer came forward with that information or raised any questions when a gun was later found near Webster as he lay at the scene. An eyewitness, a taxi driver who had aided in the chase, maintained that he saw Webster emerge from the van unarmed and with his hands up. One HPD sergeant at the scene discounted his story, however. The HPD lieutenant who later investigated the matter questioned the taxi driver and eventually recommended ignoring his story. As a result of the perfunctory HPD investigation, carried out the next day, the "throw down" prevented the truth about the incident from emerging for almost a year.

John and Billie Webster, Randall's parents, were troubled by unanswered questions regarding the shooting, particularly the question of why their young son would brandish an empty gun at three armed policemen. They persuaded federal agents to investigate the shooting. The agents traced the gun found at Webster's side as having come from the HPD property room. It had been listed on the records as having been destroyed over a dozen years earlier.[2] Eventually, the full story of the incident as described above was disclosed.

Webster's parents sued under 42 U.S.C. § 1983, asserting that the actions of several HPD officers, including Mays, Olin, and Holloway, had resulted in the deprivation of the constitutional rights of their son and under the Texas law a wrongful death. The district court entered judgment based on a jury verdict awarding the parents $2548.73 in actual damages for medical and funeral expenses and $200,000 in punitive damages from the City. The City appeal-

1. Wounding or killing an unarmed suspect or arrestee would normally be an unwarranted use of deadly force. To make an unjustified shooting appear justified, a police officer can lay or "throw down" a gun or knife, which is usually not traceable to the officer, next to the victim. In a similar manner, drugs or other controlled substances may be "thrown down" or planted on a victim of an unfounded arrest.

2. In the course of its work, the HPD confiscates a large number of weapons, which it stores in its property room. The weapons are apparently melted down after a certain limited period of time. Actually, while some guns are melted down, some simply "disappear."

ed, and a panel of this Court affirmed the finding of liability, rejected the award of punitive damages, and remanded for a retrial on the issue of damages. The panel held that the jury verdict could not stand since it awarded no damages at all for the invasion of Webster's constitutional rights or for his parents' loss of his companionship and mental anguish. 689 F.2d at 1230.

## II. *The Deprivations of Federal Rights*

The initial inquiry in any § 1983 suit is whether the plaintiff has been deprived of, in the terms of the statute, a right "secured by the Constitution and laws."[3] This inquiry need not be overburdened with a lengthy analysis of what constitutional rights of Webster were invaded when he was fatally shot while unarmed and in the custody of HPD officers. Every person has a constitutional right to be free from the use of excessive force during his arrest or while in custody.[4] The critical constitutional issue in holding the City of Houston

and the HPD liable, however, grows out of the use of the throw down gun by HPD officers after the shooting. Further, the subsequent concealment by officers of the true circumstances of the incident, coupled with the wholly inadequate HPD investigation in a situation which obviously called for a thorough investigation, also raises the issue of the deprivation of Webster's and his parents' federal constitutional and statutory[5] rights.

Following the lead of the Supreme Court, this Court has recognized that the "right of access to the courts is basic to our system of government, and it is well established today that it is one of the fundamental rights protected by the Constitution."[6] This right is a substantive right under the Constitution[7] with which a state may not interfere except for compelling state interests. Further, a cause of action is "property" under the Fourteenth Amendment.[8]

**3.** *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981); *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970); *Fontana v. Barham,* 707 F.2d 221, 225 (5th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). Here, of course, there is no question that "the conduct complained of was committed by ... person[s] acting under color of state law." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981).

**4.** *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981). *See also Williams v. Kelley,* 624 F.2d 695, 697 (5th Cir.1980), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981); *Hamilton v. Chaffin,* 506 F.2d 904, 909 (5th Cir.1975); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

**5.** Deprivations of certain rights under federal statute are actionable under § 1983. *See Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980); *see generally The Supreme Court, 1979 Term,* 94 Harv.L.Rev. 215 (1980).

**6.** *Ryland v. Shapiro,* 708 F.2d 967, 971 (5th Cir.1983).

**7.** *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974) (the right "is founded in the Due Process Clause and assures that no person will be denied the

opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights"); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972) (right is "indeed but one aspect of the right of petition" under the First Amendment); *NAACP v. Button,* 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963) (under the First Amendment); *Chambers v. Baltimore & Ohio Railroad,* 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907) (guaranteed as one of the privileges and immunities accorded under Article IV of the Constitution and the Fourteenth Amendment); *Mitchum v. Purvis,* 650 F.2d 647, 648 (5th Cir. 1981) (Due Process Clause); *Rudolph v. Locke,* 594 F.2d 1076, 1078 (5th Cir.1979) (Due Process Clause); *Wilson v. Thompson,* 593 F.2d 1375, 1387 (5th Cir.1979) ("access to the courts is protected by the First Amendment right to petition for redress of grievances"); *cf. Doe v. A Corp.,* 709 F.2d 1043, 1048 & n. 15 (5th Cir.1983) ("the courtroom door should not lightly be barred to a person who has a tenable legal claim").

**8.** *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982) ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause," citing to *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)); *Fontana v. Barham,* 707 F.2d 221, 226 (5th Cir. 1983), *cert. denied,* — U.S. —, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984).

Thus, any governmental interference with the substantive right of legal process to establish or defend against a claim, absent some justifying and compelling state interest, or any governmental taking of the property right in a cause of action without due process of law, amounts to a deprivation of rights secured under the Constitution.[9]

One obvious purpose of a throw down weapon is to conceal *from the victim* or his legal representatives the fact that the use of deadly force was unwarranted.[10] At least in part, this is because the shooting or killing of an unarmed person opens the possibility that the officer will be held accountable in civil tort damages for the results of his actions. Texas, like other states, affords to the victim of a needless killing and his legal representatives an action for damages under the State's wrongful death[11] and survival[12] statutes. The decedent, through his heirs or personal representative in a common law action under the survival statute, may recover for his physical pain and mental anguish and for other expenses incurred by his estate.[13] In an action for wrongful death, parents may recover for loss of companionship and society and for mental anguish suffered as a result of the death of their child[14] as well as for any pecuniary loss.[15]

The placing or "throwing down" of a gun or knife next to a decedent cuts off those claims that a decedent and his survivors have for redress of the injuries inflicted upon them. A fully "successful" throw down weapon episode is a flagrant concealment of the truth that the shooting was actually needless and wrong. Even if the truth is eventually exposed, the victims' chances of recovering are prejudiced from the delay. The albeit temporary taking causes "stale evidence and the fading of material facts in the minds of potential witnesses" and probably greater expense in litigating the claim.[16] Mere delay alone can be a constitutional deprivation.

The victim of a wrongful shooting by a police officer also has a claim under 42 U.S.C. § 1983 for redress of substantive constitutional violations such as the use of excessive force during an arrest, the infliction of cruel and unusual punishment upon one in custody, or the taking of life without due process of law. *See* 18 U.S.C. § 242; *United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). A police cover-up by the use of a throw down weapon thwarts any § 1983 claim for redress and thus deprives the victim, already stripped of substantive constitutional rights, of his statutory right under § 1983 to be made whole.[17] Necessarily, that deprivation of a right secured by a law of the

**9.** *See Ryland v. Shapiro,* 708 F.2d 967, 972 (5th Cir.1983); *Fontana v. Barham,* 707 F.2d 221, 226 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984).

**10.** The invasion of the constitutional liberties of the plaintiffs and their son is the center of focus. In a narrow legal sense their claims are the subject matter of this case. But there must be emphasis also upon the serious concern of the general public in any case involving grave misconduct by public officers than later concealed from the public as well as the victims. The use of the throw down gun and the coverup is of vital concern to every citizen, since every citizen is vulnerable to police misconduct and then a coverup. In emphasizing the precise legal posture of this case, it is not intended to lessen the broad implications to all citizens of such reprehensible police actions.

**11.** Tex.Rev.Civ.Stat.Ann. art. 4671–4678 (Vernon 1958 & Supp.1984).

**12.** Tex.Rev.Civ.Stat.Ann. art. 5525 (Vernon 1958).

**13.** *See Bedgood v. Madalin,* 600 S.W.2d 773, 775 (Tex.1980); *Landers v. B.F. Goodrich Co.,* 369 S.W.2d 33, 35 (Tex.1963); *Mitchell v. Akers,* 401 S.W.2d 907, 911 (Tex.Civ.App.—Dallas 1966, writ ref'd. n.r.e.).

**14.** *See Sanchez v. Schindler,* 651 S.W.2d 249, 251, 253 (Tex.1983).

**15.** *See, e.g., Bedgood v. Madalin,* 600 S.W.2d 773, 775 (Tex.1980); *see generally* 15 St. Mary's L.J. 185 (1983).

**16.** *Ryland v. Shapiro,* 708 F.2d 967, 975 (5th Cir.1983).

**17.** A victim's § 1983 claims for violations of civil rights under color of state law resulting in death will survive in favor of his heirs and personal representative under Texas survival

United States under § 1983 is itself also cognizable under § 1983. Otherwise, persons with valid claims for deprivation of civil rights would be without redress for unjustified interference with such claims under color of state law. Moreover, police officers would be indirectly encouraged to conceal the circumstances surrounding police misconduct. A successful cover-up would free the police officer from the consequences of his misconduct. Even an attempted cover up that later collapses exposes him only to the liability already incurred for the original deprivations. His attempted cover up by means of the throw down gun would not be an additional violation of constitutional or other federal rights. If we do not recognize this § 1983 right, the policeman runs no risk of greater liability by attempting a cover up.

In sum, both Webster and his parents were deprived of rights secured by the Constitution or laws of the United States. Webster's constitutional right to be free from the use of excessive force during his arrest was violated when he was shot and killed by officer Mays. Further, by improperly arranging for it to appear that Webster had been armed, the police officers interfered with his pre-existing right to due process of law in the courts. Similarly, his parents' substantive rights of access to the courts and property rights under Texas wrongful death law were transgressed. Finally, the actions of the officers deprived Webster of constitutional due process and his federal statutory right to seek redress under § 1983 which arose when his substantive constitutional and statutory rights were violated under color of state law. If these deprivations can be found to be pursuant to a policy or custom of the City, the City is also liable.[18]

law, Tex.Rev.Civ.Stat.Ann. art. 5525 (Vernon 1958). The Texas law controls in this case since it is not inconsistent with the Constitution or federal law, 42 U.S.C. § 1988. *See Wolfer v. Thaler,* 525 F.2d 977, 978 & n. 1 (5th Cir.), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 800 (1976); *see also Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978); *Brazier v. Cherry,* 293 F.2d 401, 405–06 (5th Cir.) ("Congress adopted as federal law the currently effective state law on the general right of survival."), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961).

**18.** The conclusion that Webster's rights under the constitution and federal law were invaded by the use of a throw down gun raises the issue of the relevance of a decision by this Court which is not referred to by either party in the briefs. The case is *Whitehurst v. Wright,* 592 F.2d 834 (5th Cir.1979), which involved a claim of civil rights violation brought by the mother of a victim of a police shooting in which a throw down gun was used. In that case we held that the use of the throw down gun did not constitute a constitutional violation of the rights of the deceased because "[a]fter death, one is no longer a person within our constitutional and statutory framework and has no rights of which he may be deprived." 592 F.2d at 840 (footnote omitted). That narrow holding was based upon the conclusion that the purpose of the use of the throw down gun was solely to protect the police officer. We held in that case that while the conduct was obviously wrongful, there were other civil and criminal remedies for it.

Other decisions have held that actions taken against a person's body after death even though designed to conceal the circumstances surrounding the death do not give rise to constitutional claims on behalf of the deceased. These are cases such as *Silkwood v. Kerr-McGee,* 637 F.2d 743 (10th Cir.1980), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981) and *Guyton v. Phillips,* 606 F.2d 248 (9th Cir.1979), *cert. denied,* 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980). In both of those cases, however, the actions taken clearly were organized and carried out after the death and were not a continuum of the circumstances of the death itself.

The *Whitehurst* case is factually distinguishable from Webster's situation because Whitehurst was clearly deceased at the time the throw down gun was placed alongside the body. In contrast, it is clear that Webster was still alive at the time the throw down gun was put in place. We, in dissent, do not rely upon this distinction, however, because it would make constitutional and statutory rights in such a case depend upon the moment of death.

The critical difference between the situation here involved and the *Whitehurst* case is found in the fact that the use of the throw down gun is shown to be not an isolated instance, but a course of conduct or custom which was used, *sub rosa,* in the HPD to conceal other civil rights violations such as the use of excessive force in making arrests. *Whitehurst* was a case in which a claim was based upon one isolated incident. In the principal case, as the evidence shows, the use of the throw down gun was part of a continuum of the use of excessive force and the concealment was part of a custom of the police department. Insofar as the *Whitehurst*

## III. *Municipal Liability Under Section 1983*

In its Suggestion for Rehearing En Banc, the City urged that this case presents an appropriate occasion for this Court to clarify certain aspects of § 1983 municipal liability in the Fifth Circuit. The City argued that the panel so misunderstood the standards for such liability that it incorrectly found sufficient evidence to support the jury's verdict against the City. This assertion is not supported by the record.

The broad sweep of the statutory provision itself should first be emphasized:

42 U.S.C. § 1983. Civil action for deprivation of rights.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

When enacted almost 113 years ago, § 1983 was the first of four sections comprising the Civil Rights Act of 1871.[19] It was reported as a bill "to enforce the provisions of the fourteenth amendment to the Constitution of the United States" and was popularly known as the "Ku Klux Klan Act." The Act was part of a legislative response to the birth and spreading of violence in the South by the Ku Klux Klan and other similar groups following the Civil War. By 1871, it had become clear to Congress that the tacit complicity and deliberate inactivity of some Southern state and local officials insidiously fostered the Klan's vigilante terrorism.[20] So sections 2 through 4 of the Act were targeted at suppressing the officially-condoned private terrorism of the time. Section 1, now codified as § 1983, did no more than add civil remedies to the criminal penalties already established by the earlier 1866 Civil Rights Act. It was generally an uncontroversial part of the Act.[21]

For ninety years the import of what is now § 1983 was largely nullified by an initial restrictive judicial interpretation of the Fourteenth Amendment itself, which focused upon the "privileges and immunities" of U.S. citizens, finding them to be almost non-existent, and also upon "state action" limitations.[22] Only later did the due process clause of the Amendment become the great protector of individual liberties, including those "read into" the clause from the Bill of Rights. Then, in 1961, the Supreme Court discarded its previous picture of private civil rights enforcement and started on a new canvas in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d

case might be viewed as going beyond the narrow facts of an isolated incident where the only claim of the constitutional violation is the use of a throw down gun after the death of the victim, it is not the law.

Here, Webster was deprived before and at his death of constitutional and statutory rights involving freedom from the use of excessive force and access to the courts to vindicate constitutional rights. This decedent, through his estate pursuant to Texas law, is entitled to sue under § 1983 for the delay to and interference with his cause of action for those violations so long as the deprivations arose from a person acting under color of state law.

**19.** Act of April 20, 1871, Ch. 22, 17 Stat. 13 (1871).

**20.** Note, *Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1153

(1977). For overviews of the legislative history of the Act, *see id.* at 1141–56; Note, *Municipal Liability Under Section 1983: The Meaning of "Policy or Custom,"* 79 Colum.L.Rev. 304, 307–09 (1979).

**21.** *Monell v. Department of Social Services,* 436 U.S. 658, 665, 98 S.Ct. 2018, 2023, 56 L.Ed.2d 611 (1978).

**22.** *The Slaughterhouse Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873); *United States v. Cruikshank,* 92 U.S. 542, 551–52, 554, 23 L.Ed. 588 (1876); *The Civil Rights Cases,* 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883); *United States v. Harris,* 106 U.S. 629, 638, 1 S.Ct. 601, 608, 27 L.Ed. 290 (1888); *Barney v. City of New York,* 193 U.S. 430, 438–39, 24 S.Ct. 502, 503–504, 48 L.Ed. 737 (1904); *see generally Developments, supra* note 20, at 1156–61; Williams, *The Twilight of State Action,* 41 Tex.L.Rev. 347 (1963).

492 (1961). There, thirteen Chicago policemen burst into the plaintiffs' home without a warrant and subjected the family to an array of physical and mental abuses. *Id.* at 169, 81 S.Ct. at 474. The Supreme Court reversed a lower court dismissal of the plaintiffs' § 1983 claims. It found a cause of action for invasion of the family's constitutional rights under color of state law even though the police officers acted contrary to state law. *Id.* at 187, 81 S.Ct. at 484.

The Court would not recognize a similar claim against the City of Chicago, however, under its reading of the legislative history of the Ku Klux Klan Act. It was unwilling to recognize a municipality as a "person" under the statute. It emphasized particularly the early rejection of the proposed amendment by Senator Sherman which would have imposed municipal liability for private deprivations of civil rights. *Id.* at 187–92, 81 S.Ct. at 484–86.[23] Nonetheless, *Monroe* forged § 1983 into a vital tool for preventing deprivations of civil rights by state or local officials acting under color of state law by making such officials personally liable for compensating the victims of such invasions of personal liberty.[24]

Seventeen years after *Monroe* the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), reevaluated its prior restrictive interpretation of § 1983 excluding municipalities from liability. In *Monell*, female employees of both the Department of Social Services and the Board of Education of the City of New York sued under § 1983 alleging that the Department and Board had as a matter of official policy unconstitutionally compelled pregnant employees to take unpaid leaves of absence before such leaves were medically justifiable. Although constitutional injury was presumed, plaintiffs were denied relief in the lower courts based on *Monroe*.[25] On appeal, the Supreme Court looked to the same legislative history relied upon in *Monroe* and determined that the legislators who enacted the Ku Klux Klan Act 107 years before did intend that municipalities be considered "persons" under § 1983. *Id.* at 690, 98 S.Ct. at 2035–36. The contrary holding of *Monroe* was overruled. *Id.* at 663, 98 S.Ct. at 2022.

The Court, however, did not leave the § 1983 exposure of local governments unlimited, and the boundaries set by this holding raise the critical issue in this case. The Court announced that a city would not be liable under § 1983 for acts of its employees merely because it employed wrongdoers. There was to be no respondeat superior liability. *Id.* at 691, 98 S.Ct. at 2036. Although generally unpopular with legal commentators[26] and "merely advisory,"[27]

---

**23.** *See also City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1972).

**24.** Between 1871 and 1920, only 21 cases were brought under § 1983. In 1960, still before *Monroe*, only about 300 federal suits were brought under all the civil rights acts. By 1972, about 8,000 suits were filed under § 1983 alone. In 1976, there were almost 13,000 general and 6300 state prisoner civil rights actions pending in the federal courts. *Developments, supra* note 20, at 1136 n. 7, 1161 n. 139 (citations omitted). In the fiscal year 1983, 9,938 general civil rights actions (those other than voting, employment, accommodations, and welfare rights suits) were filed, along with 18,477 prisoner civil rights actions. Out of 87,935 total private federal question cases filed in the year 1983 in the federal district courts, 26,753 were based on the general civil rights statutes. *See* Administrative Office of the United States Courts, 1983 Annual Report of the Director A–6 & –7, Table C2.

**25.** *See Monell v. Department of Social Services*, 532 F.2d 259, 262–63 (2d Cir.1976); *Monell v. Department of Social Services*, 394 F.Supp. 853, 855 (S.D.N.Y.1975).

**26.** *See, e.g.,* C.J. Antieau, 1 *Federal Civil Rights Acts: Civil Practice* 174 (2d ed. 1980); P.H. Schuck, *Suing Our Servants, 1980 The Supreme Court Review* 281, (1981); Schnapper, *Civil Rights Litigation After Monell,* 79 Colum.L.Rev. 213, 215 n. 15 (1979); Comment, *Section 1983 Municipal Liability and the Doctrine of Respondeat Superior,* 46 U.Chi.L.Rev. 935 (1979).

**27.** 436 U.S. at 714, 98 S.Ct. at 2047 (Stevens, J., concurring in part); *see infra,* note 29.

this limitation on city liability under § 1983 has now become settled law.[28]

Of the utmost importance to the case before us is the distinct category of coverage of municipalities which the court based upon "custom," as opposed to specific enacted law.[29] The Court recognized that "local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations brought about under governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91, 98 S.Ct. at 2036. The Court said that governmental custom, like official policy, can be established by a city's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694, 98 S.Ct. at 2037–38. *See, e.g., Wolf-Lillie v. Sonquist,* 699 F.2d 864, 870 (7th Cir.1983); *Berry v. McLemore,* 670 F.2d 30, 32 (5th Cir.1982).

In *Monell* the Court quoted two prior decisions it found relevant in defining governmental custom. The first of these was *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), a case of significant relevance to the issue before us. *Adickes* concerned the refusal of Kress, a private department store, to serve a racially integrated group of customers in its restaurant. The issue was whether such otherwise private conduct amounted to "state action" under § 1983. The Court reversed a directed verdict in favor of defendant Kress, declaring that a custom of state officials (i.e., of tolerating private vio-

lence or threats of violence directed towards those persons who would not conform to the practice of segregating the races at restaurants or of harassing and punishing those persons through false arrests for vagrancy) has the coercive force of law for private deprivations to be "under color of law ... or custom." "Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 167–68, 90 S.Ct. at 1613–14.

The other case was *Nashville, Chattanooga & St. Louis Railway v. Browning,* 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940). In that case the Court held that taxing railroad and public utility property at a higher rate than other property was not discriminatory, although not expressly authorized by state law. There was no question that the Legislature could tax different classes of property at different rates. The disparate taxation was found to be so uniformly followed as to constitute a virtual amendment to the statute. Justice Frankfurter, for the Court, stated that "[s]ettled state practice ... can establish what is state law.... Deeply embedded traditional ways of carrying out state policy ... are often tougher and truer law than the dead words of the written text." *Id.* at 369, 60 S.Ct. at 972.

It should be emphasized, however, that "governmental" custom is not found only in practices so locally compelling as to have

**28.** *See, e.g., Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Owen v. City of Independence,* 445 U.S. 622, 655 n. 39, 100 S.Ct. 1398, 1417 n. 39, 63 L.Ed.2d 673 (1980); *Walters v. City of Ocean Springs,* 626 F.2d 1317, 1323 (5th Cir.1980); *Dean v. Gladney,* 621 F.2d 1331, 1335 n. 11, 1336–37 (5th Cir. 1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1521, 67 L.Ed.2d 819 (1981).

**29.** The Court interpreted § 1983 also to apply to municipalities where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," *id.* at 690, 98 S.Ct. at 2035–36, or has "received formal approval through the body's official decisionmaking channels," *id.* at

690–91, 98 S.Ct. at 2036. This official policy could be "made by [the local government's] lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Further, such policy had to be the "moving force" behind the injury. *Id.* at 694–95, 98 S.Ct. at 2037–38.

*Monell* itself "unquestionably" involved such official policy, *id.* at 694–95, 98 S.Ct. at 2038, since the plaintiffs were challenging the "rules and regulations" of the defendant city agencies. *See Monell v. Department of Social Services,* 532 F.2d 259, 260 (2d Cir.1976); *Monell v. Department of Social Services,* 394 F.Supp. 853, 854 (S.D.N.Y.1975).

*See also Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981).

such coercive force of law on private citizens that private conduct becomes state action, as in *Adickes*, or practices so settled as to function as a de facto amendment to state law, as in *Browning*.[30] Rather, as the Court said in *Monell*, "Congress included customs and usages [in § 1983] because of *persistent and widespread* discriminatory practices of state officials."[31] This is made clear by the original setting and purpose of the statute. At the time of the passage of the Act, some local law enforcement officials were systematically refusing to enforce state criminal laws against members of the Ku Klux Klan and similar groups. State law did not sanction or permit such discrimination, and in some cases the highest state officials opposed that discrimination. But individual state employees who actually carried out the administration of the criminal law pursued the non-enforcement practices nonetheless. Thus, custom and usage in the statutory provision which is now § 1983 actually covered "persistent and widespread" practices of ordinary sheriffs and prosecutors in failing to protect the rights of citizens. Custom and usage was not limited to the acts of policymaking officials.[32] This background of the adoption of the Ku Klux Klan Act is of the utmost importance to the proper resolution of the instant case.[33]

The Supreme Court recognized it was presenting only the faintest pencil sketch of the "full contours of municipal liability under § 1983" in *Monell*. It expressly deferred "further development of this action to another day." *Id.* at 695, 98 S.Ct. at 2038. The Supreme Court's "other day" has yet to arrive.

This Court has only begun to flesh out the skeletal contours left by *Monell*. We have taken a relatively restrained view of the breadth of both official policy and governmental custom. Of course, we have held a city not to be liable under § 1983 where there is no evidence that the deprivations occurred as a result of the city's policy or custom.[34] Instead, for a city to be held liable we have required an identifiable causal connection between some action or inaction by the city and the asserted constitutional deprivation.[35] For example, we

**30.** *See* Schnapper, *supra* note 26, at 228.

**31.** *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970) (emphasis added).

**32.** *See* Schnapper, *supra* note 26, at 229. Within their authority, policymaking officials act and speak for a city. Consequently, no custom or pattern must be proved for the city to be liable for their conduct as city officials in carrying out established city policy. The purpose of the custom or usage exception is to cover the actions of non-policymaking government employees whose actions are tolerated by the policymakers.

**33.** The legislative history of § 1983 shows that the 42nd Congress in 1871 was concerned less with the statutes enacted in the Southern states after the Civil War—these were rarely unconstitutional on their face—than with the lack of enforcement and general maladministration of these laws by state officials. *See* Schnapper, *supra* note 26, at 232–33. It was the practices of the local state officials that were offensive, not the laws under which they acted.

From this it is clear that a customary *practice* among municipal employees may be proved despite the existence of formal written city *policy* forbidding that practice or the particular constitutional violations which flow from it. *Monell* itself allows § 1983 liability for governmental custom which causes injury to federal rights "even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

**34.** *See, e.g., Brewer v. Blackwell*, 692 F.2d 387, 400–01 (5th Cir.1982); *Walters v. City of Ocean Springs*, 626 F.2d 1317, 1323 & n. 3 (5th Cir. 1980); *Reeves v. City of Jackson*, 608 F.2d 644, 652–53 (5th Cir.1979); *Reimer v. Short*, 578 F.2d 621, 626 (5th Cir.1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1425, 59 L.Ed.2d 635 (1979).

**35.** *See Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir.1984) (en banc); *Berry v. McLemore*, 670 F.2d 30, 33 (5th Cir.1982) (citing to *Monell v. Department of Social Services*, 436 U.S. 658, 692, 98 S.Ct. 2018, 2096, 56 L.Ed.2d 611 (1978)). A clear example of the existence of such a causal connection is *Garris v. Rowland*, 678 F.2d 1264, 1274–75 (5th Cir.), *cert. denied*, 459 U.S. 864, 103 S.Ct. 143, 74 L.Ed.2d 121 (1982), where an unfounded and unlawful arrest was made in full accord with the policies and procedures of the city police department concerning arrests and arrest warrants.

have held that an isolated decision not to discipline an officer after a single episode of illegality could not itself supply the causal link. That single decision did not show a policy or custom authorizing or encouraging police misconduct through a persistent failure to discipline offending officers.[36] Our en banc decision in *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir. 1984) concisely stated this principle: "Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy." [37]

In *Languirand v. Hayden*, 717 F.2d 220, 227 (5th Cir.1983), we held a city not liable for the negligence or gross negligence of its police chief and other subordinate city officials in failing to train the particular officer who caused the alleged injury. There was no evidence of "at least a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct or that serious incompetence or misbehavior was general or widespread throughout the police force." [38] Lacking such evidence there was no support for a conclusion that city policymakers were negligent because they knew or should have known about such custom-

ary incompetence or wrongful behavior in their police force and condoned or were consciously indifferent to it. We have declared that, "A city may well have a policy with respect to police recruitment and training that is itself unconstitutional and injurious, but occasional acts of untrained policemen are not otherwise attributed to city policy or custom." *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir.1984) (en banc).

Our previous decisions, however, add only a gentle wash to the Supreme Court's preliminary sketch of the developing portrait of § 1983 municipal liability. A brief look at some of the shades other courts have said they have seen in *Monell* is helpful.

Several courts have held that the persistent failure of senior policymaking officials to take affirmative corrective or other supervisory actions can lead to the inference of an implicit official policy on the part of the local government.[39] A city's liability for conduct causing constitutional deprivations, manifested by the deliberate indifference to such conduct by its high officials, has been predicated in most cases upon a measure of actual or constructive knowl-

---

**36.** *Berry v. McLemore*, 670 F.2d 30, 32–33 (5th Cir.1982); *cf. Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir.1984) (en banc) (single instance of unequal enforcement of city building code establishes no city custom); *Lopez v. City of Austin*, 710 F.2d 196, 198 (5th Cir.1983) (single denial of merit raise in retaliation for filing EEOC charges proves no city custom or practice); *Marrero v. City of Hialeah*, 625 F.2d 499, 512 (5th Cir.1980) (custom or policy cannot be inferred from single incident of abuse by city police officers).

**37.** *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir.1984) (en banc) (no custom found unequally applying the city's building code since the plaintiff alleged no prior pattern of such violations and the evidence did not otherwise support such a conclusion). In *Bennett* we characterized governmental custom as merely one means by which to prove official city policy. Essentially, the existence of a widespread and persistent practice among city employees amounting to a custom is irrebuttable evidence of knowledge by city policymakers of the practice. *Id.* at 768. The failure to remedy the situation, despite such knowledge, imputes the resulting deprivations to the municipality. *Bennett* is a case in which the alleged wrongful acts

were taken by non-policymaking officers. We held the municipality was not liable because the acts were isolated and not shown to be in accordance with city law, custom or policy. The case is not inconsistent with our contention here. In this case a custom or policy of city officials to accept or tolerate an unconstitutional practice by subordinate public employees was established by the evidence under adequate jury instructions.

**38.** In *Languirand* we reserved the issue of whether in fact a municipality may be liable under § 1983 for a failure properly to train an officer whose negligent or grossly negligent performance of duty injures a citizen. *See also Berry v. McLemore*, 670 F.2d 30, 32–33 & n. 1 (5th Cir.1982).

**39.** *See, e.g., Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983); *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir.1981); *Turpin v. Mailet*, 619 F.2d 196, 200–01 (2d Cir.) (relying on *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

edge of prior similar constitutional deprivations in similar situations.[40] Thus, as does this Court, other courts find a single instance of misconduct insufficient to subject a local governmental unit to § 1983 liability,[41] since "a municipality cannot be held liable *solely* because it employs a tortfeasor." [42] Some courts have stated, however, that the particularly egregious circumstances of a single instance of brutality, and the number and rank of municipal employees involved in the injurious event, may give rise to an inference of official acquiescence or deliberate unconcern at a higher level.[43]

From the varied principles announced in the preceding Supreme and Circuit Court holdings and other legal commentary, we draw only those conclusions necessary to establish our view in dissent in this case. Governmental custom, the concern here, is evinced through persistent and widespread practices of ordinary municipal employees.

The rank and file policemen are involved. But so is the entire HPD and its top officers. The record shows that every top police officer from the chief on down came up through the ranks from patrolman. As we evaluate the jury verdict based upon the record in this case, all members of the department were well aware of the throw down custom.[44] Yet no specific steps to stop it were taken.

Further, the establishment of policies of the City of Houston regarding police work was delegated to the Chief of Police and the HPD by the mayor and city council. Mayor Hofheinz testified:

The state law provides for the method in which a police department is managed through the police chief. The police chief, however, does report to the mayor, but the mayor does not run the police department. The police department is run by the chief. The mayor is busy running a lot of other things on a daily

40. See *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 870 (7th Cir.1983); *Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir.1981); *Doe v. Department of Social Services,* 649 F.2d 134, 145 (2d Cir.1981); *Littlefield v. Deland,* 641 F.2d 729, 732 (10th Cir.1981); *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *McClelland v. Facteau,* 610 F.2d 693, 697 (10th Cir.1979).

41. See *Powe v. City of Chicago,* 664 F.2d 639, 650 (7th Cir.1981); *Avery v. County of Burke,* 660 F.2d 111, 114 (4th Cir.1981); *Landrigan v. City of Warwick,* 628 F.2d 736, 747 (1st Cir.1980); *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *McClelland v. Facteau,* 610 F.2d 693, 697 (10th Cir.1979). But compare *Leite v. City of Providence,* 463 F.Supp. 585, 590 (D.R.I.1978), which held that:

[C]itizens do not have to endure a 'pattern' of past police misconduct before they can sue the city under section 1983. If a municipality completely fails to train its police force, or trains its officers in a reckless or grossly negligent manner so that future police misconduct is almost inevitable, the municipality exhibits a 'deliberate indifference' to the resulting violations of a citizen's constitutional rights. In such a case, the municipality may fairly be termed as acquiescing in and implicitly authorizing such violations.

42. *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (original emphasis).

43. See *Batista v. Rodriguez,* 702 F.2d 393, 398–99 (2d Cir.1983); *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *Owens v. Haas,* 601 F.2d 1242, 1246–47 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). This Court in *Bennett v. City of Slidell,* 728 F.2d 762, 768 (5th Cir.1984) (en banc) accepted a similar, though narrower, proposition in holding that

Where the violations are flagrant or severe, the fact finder will likely require a shorter pattern of the conduct to be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation.

44. As is made clear in section IV, it is our view that there was a clear showing of a custom of the City, the existence of which caused the deprivation of federal rights. It is not a surprise of course that no City or HPD rule or other written policy mandates or condones the police conduct on February 8, 1977.

Plaintiffs do argue that since the HPD Chief of Police had risen through the ranks from the police academy to patrolman to chief, and that since all other senior supervisory HPD officers had done likewise, they were aware of throw down weapons in the department, *see infra,* note 50, and that their failure to prohibit specifically the carrying of throw down weapons or institute procedures to curb their availability would per se make the City liable here.

basis .... [T]he police department is merely one very small part of this [sic] responsibility and he operates the police department through his interaction with the police chief. The police chief runs the department.

Relating to the Mayor's testimony are several statements in our en banc opinion in *Bennett v. City of Slidell, supra,* 728 F.2d at 769. We said:

[C]ulpable policy is attributable to the governing body of the city where the policy was made by an official to whom the governing body had given policymaking authority....

The governing body retains the prerogative of the purse and the final legal control by which it may limit or revoke the authority of the official. The relinquishment of policymaking and supervision by the governing body is much more likely to exist, and be necessary, as the size and complexity of the government increases.

In *Bennett* we also said that the governing body may:

impliedly acknowledge that the agent or board acts in lieu of the governing body to set goals and to structure and design the area of the delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent or board. *Ibid.*

Affirmance on the merits in this case, therefore, could well be justified on the sole ground that the Chief of Police was the policymaker by delegation because of the size and complexity of the government of Houston, as Mayor Hofheinz described.

We in dissent do not, however, rest the decision solely on the ground that the Chief of Police was the policymaker. We insist that the court correctly charged the jury that the evidence had to establish "that there existed a regular pattern of such conduct so that it may be inferred that the City of Houston, through its high ranking officials, implicitly authorized or approved such conduct ... '[H]igh ranking officials' means the mayor, city council, the police

chief or some similarly ranked official whose acts may fairly be said to represent official policy." This instruction reflects the law accurately and is in full accord with our decision in *Bennett.*

As the per curiam opinion for the Court points out, the Court has now unanimously agreed upon a formulation to govern the imposition of municipal liability. It provides:

A municipality is liable under § 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy.

Official policy is:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

Further, the majority per curiam opinion sets out at greater length the critical instruction to the jury which was given in this case.

A careful reading of our recently adopted formulation with the entire instruction to the jury reveals a remarkable compliance at that earlier time with the law as we now state it. As developed in this opinion in the next part, we do have here "a persistent, widespread practice of city officials or employees" which is so common

it constitutes a custom. Further, the knowledge of this custom need not be actual but can be constructive as it is in this case.

The instruction to the jury was carefully crafted to require the jury to find by a preponderance of the evidence that the city through its highranking officials maintained a custom of depriving citizens of their rights through the use of unreasonable, unnecessary, or excessive force by the police department. Further, the charge went on to tell the jury that while the custom need not be formally approved by government officials, the custom must be so persistent and well settled that it is reasonable to infer that it represents official policy.

As a further caution and limitation the jury was instructed that the plaintiffs had to establish by the evidence that there existed a "regular pattern of such conduct" so that it could be inferred that the City of Houston through its highranking officials implicitly authorized or approved such conduct. Then it defined the highranking officials as the mayor, the city council, and the police chief or similar officials.

The charge then properly went on to instruct that the governmental body may be held liable for a "pervasive pattern" of abuses if the city's "inaction or ineptitude in supervising those employees" is so great that it evidenced deliberate and conscious indifference to a substantial possibility that constitutional violations would result. This requirement was met in this record. And it can be concluded from it that the jury found that the City acquiesced or implicitly authorized the violations.

The per curiam opinion for the Court says that this jury instruction did not meet the requirements of our recently approved policy formulation. We do not agree. An evaluation of the instruction as it relates to the responsibility for custom by a city as set out in that formulation clearly complies. It is well established that instructions must be taken as a whole and must not be upset if they charged the jury fairly and effectively on the theory of the case.

The jury instructions in this case fall well within our requirements: "In reviewing a district court's instructions to the jury, we consider the charge as a whole, in view of the allegations of the complaint, the evidence presented and the arguments of counsel to determine whether the jury was misled and whether it understood the issues presented." *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 300 (5th Cir.1978). "The test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." *Houston v. Herring*, 562 F.2d 347, 348 (5th Cir.1977). In *Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1358 (5th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981), the Court said: "We are convinced from a careful reading of the entire charge that it was, in substance, correct." A thorough reading of the record and the full thrust of the jury charge shows that this charge was well within the requirements set out above.

In accordance with the original theme and purpose of the Ku Klux Klan Act, a governmental entity will be held accountable for deprivations brought about by its employees who follow a practice within the governmental department which is so common and established among a significant number of the employees in that department as to be a practice widely known and followed with relative impunity. At that point, the frequency and pattern of the practice is sufficient to support a reasonable inference that the city, through its top officials, is aware or has the responsibility to be aware that city employees engage in the practice. Such a practice is a governmental custom and is as much a part of that government as are the positive laws and actions of its policymakers. The municipality is liable because its policymaking officials—those who in their sphere of policymaking authority speak and act as the city—should know about the existence of a practice so prevalent as to be custom, and yet condone or deliberately ignore the prac-

tice and its consequences. In that way, those officials, and thus the city, join in the infliction of the ultimate injury.

The spirit and the reality of *Monell* make municipalities and their public officials liable for unconstitutional policies they enforce or customs they condone. 98 S.Ct. at 2041. The highest public officials of the city must not be able to escape liability by the subjective claim that they did not know of the persistent or permeating violations. Otherwise, the more the public officials abdicate responsibilities the freer they will be from liability. Eyes, ears, and mind totally closed to evil would insure against ever being held liable under Section 1983. This would be a perverse result. The jury found on adequate evidence and pursuant to proper jury instruction that the top officials of the city were involved in the persistence of the custom. That is enough.

We stress the importance of the fact that this is a case involving a custom of carrying and using throw down weapons that directly leads to the use of excessive force in arrests by covering up the use of excessive force, and the further cover up of the fact that a throw down weapon has been used. As is shown in the following part of the opinion, the existence of both of these aspects of the custom were convincingly demonstrated by the evidence in this case. Our recent en banc decision in *Bennett v. City of Slidell, supra,* is readily distinguishable. That case involved an isolated instance of actions taken against a citizen of the city for personal reasons by high ranking but nonpolicymaking public officials. We held in that case that no city policy was established under those facts. *Bennett* recognized, as we have earlier

pointed out, that custom is a separate justification for holding a city and its officials responsible under Section 1983. *Bennett* raises the issue of the existence of an authoritative governmental policy. In contrast, this is a case which involves custom rather than policy. In *Bennett,* on its facts, a policy was found not to exist. In this case, on its facts, a custom was found to exist under a careful and fully adequate jury charge. The *Bennett* holding falls far short of controlling this case.

Finally, we stress the *sub rosa* nature of any custom which if widely known would be recognized by everyone but the self-served insiders as manifestly and overwhelmingly wrong. In such circumstances custom must properly be provable by evidence that a limited number of municipal employees follow the practice, or from evidence of fewer examples of such a practice. The usual high levels of persistency and pervasiveness cannot be required in these atypical cases because the risk of serious injury to the public is so great and because municipal employees would be expected to conclude, on fewer instances of such a practice or sooner after its inception, that reasonably diligent city policymakers must know about the practice and are willing to disregard it.

### IV. *The Custom* [45]

A careful and full reading of the trial transcript discloses ample evidence supporting the jury's finding that a policy or custom of the City caused deprivations of Webster's and his parents' federal constitutional and statutory rights. Of course, there is testimony from top police officials

---

**45.** Initially, it should be recognized that § 1983 actions against cities and their police departments for officer misconduct cannot be allowed to escalate into sweeping re-trials of every instance of police impropriety no matter how dissimilar. To prevent such a destructive inquisition, the Court below granted the City's motion in limine, over plaintiffs' objection, excluding evidence of previous cases of police misconduct not involving throw down weapons.

We should be concerned about so delimiting proof of § 1983 causes of action essentially premised on police department or city custom as to

prevent proof of a persistent pattern of similar misconduct from which such custom can be inferred. In our view, the District Court unduly restricted relevant evidence during the pretrial conference when it stated it did not "want to try all of those Benoit, Joyvies, Torres cases again in this Court." Testimony at trial indicated that the "Joyvies" case involved the use of a throw down gun, so it would clearly have been relevant. However, the record shows the fact that the Joyvies incident did take place was put before the jury by testimony.

and other police denying any knowledge of or condoning the use of throw downs. Several officers testified they knew discovery of use of a throw down would lead to discipline. Admittedly, the evidence shows that written HPD rules specifically forbid excessive use of force, altering the scene of a crime, and concealment of improper police activity. These rules forbid all three of the improper actions in this case. But as we have pointed out and as § 1983 has contemplated from its inception, a custom which violates the written law nevertheless can violate § 1983.

The jury had a right to believe the evidence set out before while in the process of disbelieving conflicting testimony. The jury was entitled to discredit the above self-serving testimony and believe the strong evidence to the contrary.

The carrying of throw down weapons was an established custom among HPD police officers. The practice was widely acknowledged and frequently discussed. Former police lieutenant Dillon, one of the supervisory HPD officers at the scene of the shooting, testified that every officer on the force in 1977—"in my opinion ... one hundred percent"—understood the term "throw down." Former officer Holloway testified:

> What [he and his partner] discussed was whether we should carry [a throw down

weapon] or not. . . . I would go as far as to say ... and I have had regular partners before ... that most partners would discuss that, because it would be something that would be on your mind.

Holloway's partner, former officer Olin, agreed that they had discussed whether to carry and when to use a throw down weapon and that such weapons were "necessary evils." Former officer Estes agreed that he had learned about throw down weapons through shop talk and that they were the subject of common discussion in the force. In fact, former officer Byrd stated that "as far as the superiors, they don't directly condone it. They know it happens." This is borne out by Dillon's testimony that he had heard discussions of the use or potential use of throw down weapons among fellow officers.

It was brought out that as early as 1964 HPD instructors at the police academy, where new recruits are taught how to be officers of the law, had "casually mentioned" that an officer who happened to shoot an unarmed suspect "best have something to lay down" to protect himself.[46] The jury heard testimony that the operation of the HPD property room was lax and casual. This testimony firmly supported a jury inference that officers were easily able to obtain the difficult-to-trace weapons stored there.[47] Moreover, the na-

---

**46.** Dillon testified that he had first heard of the throw down weapon in the Police Academy:

A. It would be brought up like when [the instructors] would be sitting at various crime scenes for instruction, it would be casually mentioned that if you ever shot anyone accidentally, well, you had best have something to lay down to protect yourself.

Q. To protect yourself from possible [sic] truth coming out as to the shooting?

A. Yes, sir.

Q. In other words, to cover up the true facts of the event?

A. Yes, sir.

Byrd stated that "throw downs" were "just something that is just more or less mentioned but not ever directly discussed [at the police academy]."

**47.** George Walker, the supervisor of the HPD property room in 1968 when the throw down gun involved here was obtained, testified:

Q. [I]n fact it is my understanding that the back door [of the property room] would be left open at times.

A. That's correct.

Q. And it wasn't uncommon in 1968 for police officers that were not assigned to the property room to come in and out of the property room from that back door?

A. Occasionally they would.

. . . . .

Q. [T]he fact is you attempted to go through superiors within the Police Department at one time or another requesting either more personnel in the property room or added security, correct, sir?

A. Yes, sir.

. . . . .

Q. And when those bags or tow sacks of weapons were taken down to the melting location as I understand it nobody looked in the bags to make sure that the guns that

ture and outcome of the grossly inadequate investigation of Webster's shooting, showed that officers using "throw downs" had a great likelihood of success. As brought out at trial, this investigation was in full accord with prevailing HPD policy. Yet the investigation turned up nothing suspicious about shooting a young man in the back of the head under a claim that he got out of a stolen van and pointed an unloaded gun at three armed policemen. To get the complete picture of the coverup of the use of the throw down a summary of the inadequacies of the investigation is instructive:

1. The testimony of the taxi driver that Webster was not armed was rejected and pressure was put upon him to change his story by telling him he was wrong and calling him back to pressure him again.

2. The bullet which killed Webster passed through his head and through his right hand, the one in which he allegedly was carrying the gun. Yet no evaluation was given to the fact that the gun was not damaged and had no blood on it although the nature of the wound in the hand showed that the gun would almost have to have been damaged and, of course, blood stained.

3. The investigating officer never looked at the photographs of the scene of the incident. They showed an undamaged and unbloodstained gun.

4. The officer ignored the testimony of the medical examiner that the trajectory of the bullet showed Webster was on his knees or was further on the ground when shot. The investigation accepted police officer testimony that Webster was standing when shot although he was substantially taller than the officer who shot him.

5. No fingerprint study of the gun was made on the ground fingerprints can rarely be taken from guns.

6. No attempt was made to trace the gun in property room records.

7. No attempt was made to interview all the officers who were at the scene of the shooting.

This evidence could properly have shouted "coverup" to the jury. Taken with other evidence it can show a custom or practice of the use of throw downs and a cover up. Only the persistence of the victim's parents and the intervention of federal authorities in this case exposed the outrageous events.

Finally, there was direct testimony that thrown down weapons were readily accessible and sometimes used. Olin agreed that in 1977 it was common knowledge that throw downs were available to police officers who might need one. Byrd concurred. Byrd further related that it was then "common knowledge" that at that time 75–80% of the officers on the force carried or had access to some form of "throw down," and that *most* of the officers either carried a knife or a gun [as a throw down weapon]."

. . . . .

> were listed to be destroyed or burned were actually in the tow sack, correct?
> A. No one went through it, no.
> Q. That's right. So if a gun or ten guns or a hundred guns had been taken out of a certain tow sack, you wouldn't know it?

. . . . .

> A. One or two guns wouldn't be [noticeable].

Holloway testified that the procedures in the HPD property room were lax enough for a police officer to take a weapon:

> Well, I would say as far as just speaking about firearms that there are probably a lot of firearms that are in the building, you know, that are expensive guns. I don't think [the gun laid next to Webster] was one, but I just wouldn't doubt that there have been a lot of guns that they said had been melted down that were not.

. . . . .

> A man sees a nice gun like a Colt Commander or something like that and says, 'That is too fine a gun to take and melt it down. I am going to take it home and add it to my collection.'

Further, the HPD apparently had ineffective procedures for keeping track of individual officers' guns. Byrd stated that he

> sold and swapped guns several times [since leaving the police academy] and I never personally kept up with giving [the serial number of the service revolver he happened to be carrying] to [the HPD].... I swapped with several people.... [I]f I decided to swap I would do so.

(Emphasis added). The jury had the right to believe this testimony. He testified further that "[i]t wasn't unusual" for there to have been two or three officers at the scene of the Webster shooting with throw down weapons, and that the use of throw down weapons "was just common fact. It had happened before.... [I]t is common knowledge that people know about." [48] His testimony was again supported by Dillon, who admitted that he had heard "over the radio and so forth" of the "Joyvies" case—a incident two years prior to Webster's shooting where a throw down weapon was used.[49]

From this testimony concerning the discussions of throw down weapons, their availability and use, and the casual mention of them at the police academy, the jury could properly find that there was a custom among HPD police of carrying throw down weapons. This case is a perfect example of a *sub rosa* practice (carrying and using throw down weapons) among city employees (police officers) which is so pervasive and persistent that it can be characterized as city custom despite broadly worded pronouncements to the contrary. The directives of the HPD were simply inadequate to ensure that the practice would not continue. In short, the customary practice here *was* city policy, no matter what general rules the HPD or City may have adopted or what opinions individual officers may have voiced.

Having found on the basis of adequate proof the existence of a custom condoned or deliberately ignored in practice by the city officials and the HPD, the jury also could properly conclude that this custom led to the deprivation of the federal rights of Webster and his parents. A custom among City patrolmen of carrying throw down weapons can clearly cause the use of such a weapon in certain circumstances, and the jury could reasonably find that it did here. Moreover, the jury could find that this same custom led to the use of excessive force in arresting Webster. Under exigent or heated circumstances, the knowledge that throw down weapons are readily and deliberately available to conceal wrongful conduct would be sufficient to ease a police officer's concern about the use of excessive force.[50] Quite simply, the access to easy alibis for mistaken or malicious shootings of unarmed citizens could reasonably be found to have been a cause of this particular instance of wrongful police conduct.

48. Byrd testified to an incident in 1973 [where] a Mexican boy had been shot.... [T]here was a statement made by one of the officers [involved] that made me feel like [a "throw down" had been used].... One of them made a statement to the [other] officers that were there that they had fired a couple of shots into the wall to make it look good.

49. That other prior uses of throw down weapons would not likely be widely known was conceded by Dillon:

Q. It seems obvious to me and wouldn't you agree that if a throw down weapon were used and everybody found out about it, it wouldn't be a very successful throw down weapon, would it?

A. That's correct.

Dillon's testimony indicates that the "Joyvies" throw down gun incident was highly-publicized. A failure by City policymakers, with actual knowledge of that incident from such publicity, to direct the HPD to act to prevent such an occurrence in the future could make the City liable for Webster's injury in the eyes of the jury.

50. Byrd's testimony made it clear:

The availability of a throw down weapon in any given situation was something that was known to happen. [Superiors] wouldn't condone it if anybody came up and said anything about it, but if nothing was said or anything mentioned about it—well, they knew it was going on.

Dillon admitted that just knowing that throw down weapons are available when needed, even if it is just in the back of one's mind, could prompt one to use too much force.

Q. ... [B]ased on your experience as an officer the availability of a throw down weapons or any type of coverup scheme is what we are talking about, no doubt could influence any one given officer to use more force than might be reasonably necessary in asserting an arrest?

A. Yes, sir. I guess it could.

. . . . .

Q. Because some officers will keep throw down weapons in the back of their mind even during an arrest?

A. Yes, sir.

Finally, if the City and the HPD were conscientious about terminating this opprobrious practice, the remedies were readily available. First and most important, the City could have directed the HPD to issue a specific written prohibition of the use or carrying of throw down weapons (or drugs), buttressed by appropriately severe sanctions for violators. It could have instructed the HPD to institute searching, independent investigations of asserted police misconduct and police shootings.[51] It could have prohibited any condoning reference by supervisory HPD officers, especially academy instructors, to the possible use of throw down weapons. As additional steps, the City could have directed immediate discharge of anyone found guilty of carrying a "throw down." The City could have ordered the police department to give all police officers a deadline, after which any officer found to be carrying a weapon other than their regular police service revolver would be automatically discharged. This measure could have been facilitated by periodic regular inspections of the officers' automobiles and the kits which they carry. None of these requirements would interfere in the least with proper law enforcement. Finally, the failure to maintain a careful control system in the HPD property room was an invitation to the continuation of the "throw down" custom. This laxity should have been eliminated long ago so that no officer could obtain a thrown down weapon from the property room, as the weapon used in this case was obtained.

Thus there was more than substantial evidence to support the jury verdict that Webster and his parents were deprived of their federal rights under color of state law, and that such deprivations were caused by a persistent and widespread practice among certain employees of the City which amounted to governmental custom. Diligent City policymakers knew or should have known of such a widespread even though covert custom among city employees. The operation of the HPD was their responsibility. This custom could not have existed without City policymakers condoning it, deliberately ignoring it, or closing their eyes to its possible existence. Through such action or omission, the City itself was at fault, as well as were wrongdoing officers, for the constitutional and statutory deprivations. The City, consequently, properly was held liable under § 1983.

We in dissent realize that police officers face danger each day in the course of their vital, too often unappreciated work. In no way should this Court seek to limit the reasonable and precautionary protections a police department and city can lawfully institute for its patrolmen. But society must require cities and their police departments to be aware of illegal police practices which, even in the face of contrary written city policy, become so accepted as to be internally customary. It need not be emphasized that the carrying and use of throw down weapons is a particularly shameful and egregious example of such a practice. We should disapprove as strongly as possible of police departments and acquiescent city governments allowing such a practice to flourish.

### V. *Conclusion*

This is the case the Websters proved. As a matter of post hoc rationalization this Court is demanding that after seven and one-half years, this bereaved and sorely mistreated family must retry and establish their case all over again.

If the American system of justice and judicial process demands that the jury verdict be taken away from these plaintiffs on this record, a serious weakness in our system is exposed. We in dissent do not concede such a weakness. This case was fairly and properly tried. As this opinion points out, the jury was well instructed on the responsibility of public officials including the police chief and the city council.

---

**51.** We note that the HPD formed an internal investigation division the summer following Webster's death.

This Court has now in the last two months formulated a well stated governing principle for holding cities and high public officials liable for civil rights violations. The statement is based upon Supreme Court precedent. The jury was more than adequately charged. But because the jury was not charged three and a half years ago in the precise way and the precise words so recently formulated, the Court holds this case must be tried again.

Under the facts well established in the evidence in this case and under the charge to the jury, the Court could properly find liability on the part of the City through the police chief because responsibility had been delegated to the police chief from the city council. The jury properly could also find responsibility on the part of the City through the city council's failure adequately to discharge its obligations to ensure that excessive force against citizens not be used by the police.

The most damaging aspect of the analysis relied upon by the Court is an encouragement to the top public officials of a municipality to close their eyes and ears to what is going on in city government—to see no evil and hear no evil. The holding of the majority of the Court when analyzed to its full conclusion encourages the top policymakers of a city to do nothing, to exercise no responsibilities. If they do nothing and pay no attention to what is being done, the Court is holding, in effect, that they and the city cannot be held responsible for civil rights violations. This cannot be the law. Abdication cannot relieve of responsibility.

This case is properly returned to the lower court for a retrial of the damage issue.[52] But placing as a burden upon the shoulders of these plaintiffs the necessity to retry the case in full on the merits is an onerous burden, unjustified in the law. The majority of the Court treats far too

casually a reversal for a new trial. We must not ignore the oppressive infliction of a new trial on the merits as a means merely to instruct the courts upon a more felicitous way to charge the jury in similar cases in the future. Yet that is what this Court is doing, and we must register firm and aggrieved dissent.

ALVIN B. RUBIN, Circuit Judge, with whom JOHN R. BROWN and TATE, Circuit Judges, join, dissenting:

The *Bennett* standard requires that, for a municipality to be charged with liability for actions taken pursuant to a custom, "actual or constructive knowledge of such custom must be attributable to the governing body of the municipality *or to an official to whom that body had delegated policy-making authority.*" (Emphasis supplied) Lacking prescience and hence being unable to foresee that this court would, only on application for rehearing in *Bennett*, some three years after this case was tried, preclude municipal liability based on a custom known to officials whose policy-making authority is not delegated but inherent in their high rank, the district court charged the jury, "In this connection, 'high-ranking officials' means the Mayor, City Council, the Police Chief or some similarly ranked official whose acts may fairly be said to represent official policy." He, therefore, did not require that the jury find that the "high-ranking official" be "an official to whom [the governing body of the municipality] had delegated policy-making authority."

The lack of such an instruction, however, was not the objection actually made to the charge. The objection was simply that the instruction as a whole would permit the jury to impose respondeat superior liability. Every one of my colleagues, whether in majority or dissent, agrees that § 1983

---

**52.** The panel opinion was correct in reversing the award of punitive damages. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). In that case, the Supreme Court squarely held that a municipality is immune from punitive damages in a

§ 1983 claim. The panel opinion then went on to find, based upon the record, that the jury apparently awarded punitive damages in lieu of a more complete and careful verdict as to actual damages to Randall Webster and his parents.

does not impose vicarious liability on a municipality. The charge did not, as I read it, permit the municipality merely to be liable by virtue solely of its employment of the tort-feasor and therefore was invulnerable to the objection actually made.

Considering the charge as a whole, as my brother Williams correctly says we must and should, I would affirm the judgment. I do not fault defense counsel for failing to predict *Bennett*, but neither would I reverse the district court for lacking such foresightedness or for failing to do what no one asked him to do. In short, if there be error in the clear light of hindsight, it was not plain.

I, therefore, join my brother Williams in dissent.