# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00235-CV

**Democracy Coalition, Stefan Wray, Risako Kurono, Matthew Korn, Kristan Barber, Chandra Ward, Kristin Richardson, Lucinda Beringer, Sonia Santana, Douglas Foxvog, Ann Stark, and Susana Almanza, Appellants**

**v.**

**The City of Austin, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. GN101586, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

This case involves a complaint by a community action group, the Democracy Coalition, and its individual members (collectively, appellants) that the City of AustinCthrough its police department, individual officers, and official policies as executedCviolated their constitutional rights to free speech and free assembly during President George W. Bush=s appearance in Austin shortly after he was elected. Appellants assert that the City violated their rights when police officers prevented them from assembling in a traditionally recognized free-speech area to voice their protest against the President, and when mounted officers used their horses to intimidate, physically contact, and disrupt their protest. The trial court entered a

directed verdict for the City on appellants= federal and state constitutional claims. Because appellants failed to present evidence on one or more elements of their federal claim, we affirm the judgment of the district court as to that claim. We reverse the district court=s judgment as to the state constitutional claim because the City was not entitled to judgment as a matter of law, and we remand that portion of this cause for further proceedings consistent with this opinion.

## BACKGROUND

Newly elected President George W. Bush visited Austin on April 27, 2001, to commemorate the grand opening of the Bob Bullock State History Museum. After visiting the museum, the President went to the nearby Governor=s Mansion to have lunch with Governor Rick Perry. Appellants had protested against the President at the museum and then proceeded toward the mansion to continue their protest. Appellants approached the intersection of 11th and Lavaca Streets from the northeast, intending to cross the streets and proceed to an area directly west of the mansion, which is traditionally recognized as a spot to exercise free-speech rights in full view of the media and officials visiting the mansion. Appellants were prevented from crossing the street by a row of Austin Police Department (APD) officers, who were standing just off the sidewalk=s curb in the street. The secret service allegedly asked the APD, for security reasons, to keep people from crossing the street or approaching the mansion.

As appellants approached the intersection, Sergeant Darrell Boydston called in the mounted-patrol unit to help contain the protestors on the northeast corner of the street. Four police officers mounted on horses proceeded north on Lavaca Street toward appellants. The mounted officers

2

approached appellants, using their horses to move the protestors from the street back onto the sidewalk toward a parking lot to allow the officers on foot to get out of the street to avoid oncoming traffic. Appellants were periodically chanting and shouting at the police officers but at all times were peaceful in their protest. At one point, the horse of Officer Ken Farr unexpectedly bolted into the crowd of appellants, allegedly physically contacting some of them but harming no one. Once Officer Farr regained control of his horse, he retook his position near the edge of the sidewalk with the other mounted officers. Eventually the mounted unit left the scene, but police officers on foot continued to prevent appellants from crossing the street in either direction.

Appellants filed suit in Travis County district court, alleging that the actions of the officers and their employer, the City, violated their federal and state constitutional rights to free speech and assembly; they sought damages as well as injunctive and declaratory relief. Their federal claim was filed under section 1983 of title 42 of the United States Code, which imposes liability on a government that, under color of some official policy, Acauses@ an employee to violate another=s constitutional rights. *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978); *see* 42 U.S.C.A. ' 1983 (West 2003).[1]

---

[1] Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C.A. ' 1983 (West 2003).

3

Their state claims in equity sought to enjoin the use of similar tactics in the future to control political speech, along with declaratory relief.[2] At the close of appellants= evidence, the City moved for a directed verdict, contending that appellants had presented no evidence of an official policy that was unconstitutional or of which the City had notice that was being implemented in a way to violate citizens= constitutional rights. After hearing argument on the City=s motion, the trial court entered a directed verdict, dismissing appellants= federal and state claims against the City.[3]

## DISCUSSION

### Standard of review

A directed verdict is proper only when (1) the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent, or (2) the evidence is insufficient to raise a fact issue that must be established before the opponent is entitled to judgment. *Prudential Ins. Co. of Am. v.*

---

[2] Texas does not allow a damage remedy for constitutional torts. *See City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995).

[3] The trial court allowed the trial to proceed to the jury with respect to the individual officer-defendants, Officers Carlson and Farr, on the federal claims only; the jury found that the officers had not violated the federal constitutional rights of any of the appellants. We are concerned with only the court=s judgment as to the City, because appellants do not appeal the portion of the judgment pertaining to the individual officers.

*Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). In reviewing a directed verdict, we view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983). If there is any conflicting evidence of probative value that raises a material fact issue on any theory of recovery, a determination of that issue is for the jury. *Szczepanik*, 883 S.W.2d at 649; *White*, 651 S.W.2d at 262.

Although the rules of civil procedure require a motion for directed verdict to state the specific grounds supporting it, Tex. R. Civ. P. 268, the failure to specify a ground in the motion is not fatal if there are no fact issues raised by the evidence and the prevailing party is entitled to judgment as a matter of law. *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 195 (Tex. App.CHouston [14th Dist.] 2002, no pet.) (citing *Texas Employers Ins. Ass=n v. Page*, 553 S.W.2d 98, 102 (Tex. 1977)). Similarly, even if the reason given by the trial court is erroneous, the granting of a directed verdict can be affirmed if another ground exists to support it. *Robbins v. Payne*, 55 S.W.3d 740, 746 (Tex. App.CAmarillo 2001, pet. denied) (citing *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 90 (Tex. App.CCorpus Christi 1992, writ dism=d w.o.j.)).

### Section 1983 liability

The requirements for section 1983 liability were first enunciated by the United States Supreme Court in *Monell*: (1) the execution of a government=s policy or custom, (2) that is made by the government=s lawmakers or those whose edicts or acts may fairly be said to represent official policy, (3)

5

that inflicts constitutional injury. 436 U.S. at 694.[4] ALocating a >policy= ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.@ *Board of County Comm=rs v. Brown*, 520 U.S. 397, 403-04 (1997) (citing *Monell*, 436 U.S. at 694). The Supreme Court has Aconsistently refused to hold municipalities liable under a theory of *respondeat superior*.@ *Id.* at 403. AThe >official policy= requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.@ *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Recovery from a municipality is limited to acts that the municipality has officially sanctioned or ordered. *Id.*

---

[4] A municipality is included within the purview of section 1983 liability. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 688-89 (1978).

A policy can take the form of either (1) duly promulgated policy statements, ordinances, or regulations; or (2) a widespread, persistent practice or custom of city officials or employees. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (citing *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). In this case, appellants have consistently conceded that they are not alleging the existence of a custom or practice, but rather a duly promulgated policy statement, as evidenced by the APD=s written standard operating procedures and the mounted unit trainer=s written syllabus used to teach officers crowd-control procedures. In turn, the City urged its oral motion for a directed verdict, contending that appellants had presented no evidence of the *Monell* requirements to establish a policy.[5] Although we may affirm the trial court=s judgment on any theory that would support a directed verdict for the City, *see Robbins*, 55 S.W.3d at 746, we begin by addressing the requirement of a duly promulgated policy.

Appellants cite three forms of evidence in the record to support their argument that the City had an official policy. First, the APD=s written mounted-patrol standard operating procedures state the purposes for which the mounted patrol should be used, including A[c]rowd controlCany situation requiring the control, movement, or dispersal of a large group of people in an attempt to maintain order and peace,@

---

[5] There is no written motion for directed verdict in the record. At trial, the City argued that section 1983 liability requires Athat there is a custom or policy of abuse, which we haven=t seen any evidence of, and that is so persistent and outrageous as to be either an illegal written policy or so widespread as to put the municipality on notice that there=s a problem and they failed to take action, so that it is, unofficially, their policy. . . . What=s required is notice to the municipality of, >You knew or should have know that this is . . . clearly in violation of someone=s rights.=@ The City relied on *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002), which discussed two possible theories of liability: (1) an unwritten custom or policy, of which the policymakers had actual or constructive knowledge; or (2) a failure to train police officers, under which a plaintiff must show inadequate training procedures, that inadequate training caused the constitutional violation, and that the policymakers were deliberately indifferent to the potential harm. *See id.* at 328, 331-32. The City urged that neither theory was supported by the evidence.

among other uses such as search and rescue, patrol, and civic educational demonstrations. Second, appellants cite a written lesson plan covering crowd-management tactics devised by APD Officer Mike Carlson, who teaches mounted patrol techniques to police officers. The lesson plan states that the goal of the course is Ato acquaint the student with passive crowd management on horseback.@ It defines four different types of crowdsCfrom casual (such as shoppers) to expressive (Agroup unified for common purpose directed by well-defined leadership@) to aggressive (such as a mob or riot). The lesson plan then lists four increasingly assertive forms of mounted response:

1.  Command Presence

    a.  Appear professional, uniformed and well trained

2.  Verbal Commands

    a.  Clear, concise commands when entering or moving a crowd

    b.  Allow adequate time for compliance

3.  Mounted Approach

    a.  Intimidation factor of horse

        1.  Causes crowd to move without physical contact

    b.  Slow, controlled movements allowing crowd opportunity to retreat

4.  Mounted Contact

    a.  Use of mount to physically push crowd in specific direction

    b.  Slow, controlled movements allowing crowd opportunity to retreat.

8

In conjunction with this syllabus, appellants cite training videos that show mounted officers acting in concert to move a crowd of people in a certain direction. Lastly, appellants cite testimony by APD officers on the scene on April 27. Sergeant Dukes, commander of the mounted unit, said, A[E]verything was done [that day] consistent and pursuant to City policy.@ Sergeant Hutto explained that Aeverything that happened here . . . is totally consistent with official policies of the City of Austin.@ They also cite Sergeant Dukes=s statement that the lesson plan governed the actions he ordered that day. Appellants urge that this evidence is sufficient to show that the City had an official policy that meets the first *Monell* prong.

Appellants= argument fails in light of the specific requirements of an official policy for section 1983 purposes. To subject a municipality to section 1983 liability, a Apolicy@ must either be *per se* unconstitutional (Afacially unconstitutional@) or promulgated in deliberate indifference to the Aknown or obvious consequences@ that constitutional violations would result (a Afacially innocuous policy@). *Piotrowski*, 237 F.3d at 579-80.[6] The gravamen of appellants= complaint that the policy is *per se* unconstitutional is that officers mounted on horses can never be called upon to control crowds exercising free speech and assembly (so-called Aexpressive@ crowds). Appellants contend that horses can too easily be spooked to act unpredictably, potentially causing injury to citizens, and that their use is intimidating and can chill the free exercise of speech and assembly more so than officers on foot. Thus, they conclude, the

---

[6] Justice Patterson=s concurring opinion cites testimony by the officers that they acted pursuant to the City=s official policy as evidence that the City does not contest the first *Monell* prong. However, that the officers believed they were following an official Apolicy@ of the CityCor even if they in fact wereCdoes not mean that Apolicy@ is the type contemplated by *Monell* and its progeny, as discussed *infra*.

use of horses to control political-speech crowds is fundamentally at odds with the freedoms sought to be exercised by an expressive crowd.

We are not persuaded that the three alleged enunciations of the City=s Apolicy@C mounted-patrol standard operating procedures, the training syllabus and videos, or Aadmissions@ that the events of April 27 were in accordance with City policyC constitute a facially unconstitutional policy. Despite appellants= protests that horses are dangerous and unpredictable, the use of officers mounted on horses to control crowds in general cannot be *per se* unconstitutional any more than is the use of police officers on foot. The possibility that horses might be used to control a particular type of crowdC one exercising its rights to free speech and assemblyC also is not *per se* unconstitutional. Indeed, the standard operating procedures note that crowd control is to be used in situations where order and peace must be maintained. The Apolicy@ alleged does not call for the use of mounted officers to quell free speech and assembly under any circumstances. The Apolicy@ merely allows for mounted officers to be one means the APD may use when it reasonably determines that crowd-control measures are necessary. The right to free speech does not guarantee the right to communicate one=s views at all times and places or in any manner that may be desired. *See Heffron v. International Soc=y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). It is well established that a government may establish reasonable and content-neutral time, place, and manner restrictions on the rights to free speech and assembly. *See, e.g.*, *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

Appellants insist that the APD=s actions on April 27, 2001, were content-based because some pro-Bush supporters were allowed to access the free-speech area that appellants were prevented

from reaching. But nothing in the mounted-unit operating procedures intimates that horses are to be used in such a fashion. We reject appellants= contention that the City=s policy of using mounted police officers to control crowds, even those exercising political speech, is facially unconstitutional. If a government has a legitimate state interest in controlling, containing, or physically moving a crowdCeven a peaceful crowd seeking to express itself politicallyCthen its use of reasonable means to realize such interest is not unconstitutional. We conclude that the use of officers mounted on horses is not an unreasonable means for a police department to control crowds when necessary and lawful.

Likewise, we conclude that appellants have not met their burden to show that the City=s mounted-patrol Apolicy@ was promulgated with deliberate indifference, which is a Astringent test@ for which a Ashowing of simple or even heightened negligence will not suffice.@ *Piotrowski*, 237 F.3d at 579 (citing *Brown*, 520 U.S. at 407). The record contains no evidence of actual knowledge by the City or any of its policymakers that the mounted-patrol policy has been used in other situations to squelch free speech and assembly.

We also consider whether there is evidence that the City had constructive knowledge that the alleged policy would lead to tortious conduct by police officers so as to establish the deliberate-indifference requirement. *See Brown*, 520 U.S. at 407; *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989) (AIt could . . . be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers who, nevertheless, are >deliberately indifferent= to the need.@). Even if the use of the mounted unit was not justified by a reasonable government interest to maintain peace and order but was rather the result of

11

intentional hostility or haphazard oversight, the existence of a policy that countenances the use of horses to control crowds in circumstances where peace and order must be maintained is not enough to put the government on notice that the policy could also be used solely to deprive free-speech and assembly rights. We hold that appellants= allegations that the policy could and did lead to a deprivation of free-speech and assembly rights do not amount to evidence that the City consciously disregarded the likelihood that the policy would result in such a violation.

Appellants also asserted that City police officers receive inadequate training on First Amendment rights, and that this fact brings the case into the purview of *City of Canton*. *See* 489 U.S. at 390 (single violation of federal rights could trigger liability if accompanied by showing that municipality has failed to train employees to handle recurring situations presenting obvious potential for violations). However, the only evidence in the record reveals that officers do receive training on the First Amendment as part of the state-mandated training for all peace officers. Also, even if the training the officers received was inadequate, appellants have not pointed us to any evidence of how the City would be on actual or constructive notice of such fact. *See Brown*, 520 U.S. at 407. Thus, we hold that appellants failed to establish a fact issue on the first prong of their section 1983 claim.

Even if the mounted-patrol procedures, the officers=admissions, or the inadequate training did establish official Apolicy,@ the first and third *Monell* prongs are intertwined, requiring the official policy to be the Acausal link@ to the constitutional violation. *See id.* at 405; *Piotrowski*, 237 F.3d at 580. Appellants needed to present evidence that the policy was the Amoving force@ behind the constitutional violation. *See Monell*, 436 U.S. at 694. Assuming that there was a constitutional violation, we fail to see how a Apolicy@

12

authorizing the use of police officers mounted on horses to control crowds in necessary circumstancesCeven allowing the horses to physically contact citizens to move them one direction or anotherCwas the Amoving force@ behind the alleged violation on April 27.  The alleged violation is that appellants were prevented by the APD from reaching the traditional free-speech area and were not allowed to demonstrate anywhere on the sidewalk they desired but were forced backwards towards a parking lot.  The link between the existence of a policy allowing for the use of mounted officers to control crowds to maintain peace and order and the APD=s preventing appellants from assembling where they desired is tenuous at best.[7]

The causal-link requirement entails a Ahigh threshold of proof@ and Amust not be diluted, for >[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.=@ *Piotrowski*, 237 F.3d at 580 (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)).  Here, it was not the ability to use horses to control crowds that *caused* the APD to contain appellants on the northeast corner.  Indeed, the mounted officers were merely one of the means used by the APD on that day to restrain appellants.  There is nothing inherent in the mounted-patrol Apolicy@ that would lead an officer or other City employee to use such measure to prevent citizens from exercising their rights to free speech and assembly.  Certainly, the APD could have used

_____

[7] Although appellants= petition did allege that the use of mounted contact amounted to excessive force, appellants conceded at trial that they were not asserting a cause of action under the state and federal constitutional protections against the use of excessive force.  *See* U.S. Const. amend. IV; Tex. Const. art. I, ' 13.

officers on foot to contain appellants, which it did before and after the mounted officers appeared. We hold

that appellants did not establish a fact issue on the third *Monell* prong.

Moreover, even if the evidence pointed to by appellants constituted official policy and was

the moving force behind a constitutional violation, we conclude that appellants failed to establish a fact issue

on the second *Monell* prong: that a municipal "policymaker" be charged with actual or constructive

knowledge of the alleged policy. *Pineda*, 291 F.3d at 328; *Piotrowski*, 237 F.3d at 578. Appellants

were required to establish a fact issue as to whether actual or constructive knowledge of the "policy" was

attributable to the governing body of the City or officials to whom the City had delegated policy-making

authority. *See Webster*, 735 F.2d at 841. Only municipal officials who have "final policymaking authority"

may subject the government to section 1983 liability. *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

The "policymaker" requirement has been strictly construed, requiring the policymaker to be one who "takes

the place of the governing body in a designated area of city administration," *Webster*, 735 F.2d at 841, and

who (1) decides the goals for a particular city function, (2) devises the means of achieving those goals, (3)

acts in the place of the governing body in the area of delegated responsibility, and (4) is not supervised

except as to the totality of performance. *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984).

> [T]he delegation of policymaking authority requires more than a showing of mere discretion or decisionmaking authority on the part of the delegee. . . . The governing body must expressly or impliedly acknowledge that the agent or board acts in lieu of the governing body to set goals and to structure and design the area of the delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent or board.

*Id.* If an official=s actions are subject to effective review procedures, the official has not received a complete delegation of authority and does not wield final responsibility so as to create municipal liability. *Praprotnik*, 485 U.S. at 127; *City of Lubbock v. Corbin*, 942 S.W.2d 14, 20-21 (Tex. App.CAmarillo 1996, writ denied) (building code inspector was not policymaker, even though he wielded some discretion in imposing requirements and extending permits, because his actions were subject to review by higher authority).

To satisfy *Monell*, officials or governmental bodies must Aspeak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.@ *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Whether a particular official has final policymaking authority is a question of state law. *Praprotnik*, 485 U.S. at 123-24; *Pembaur*, 475 U.S. at 483-84. Appellants introduced no evidence that the City had expressly or impliedly acknowledged that Officer Carlson acted in lieu of the City=s governing body with respect to setting goals and structuring the area of the delegated responsibilityCprotecting the First Amendment rights of citizens. *See Bennett*, 728 F.2d at 769. Likewise, Sergeants Dukes and Hutto, although believing they acted in compliance with Aofficial policy@ in summoning the mounted unit on April 27, cannot be said to represent the City so as to be Asubject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent.@ *Id.*

It is true that one decision may result in municipal liability if a municipality=s properly constituted legislative body makes a single decision that is unconstitutional. *See Pembaur*, 475 U.S. at 480; *Owen v. City of Independence*, 445 U.S. 622, 633 (1980) (city council passed resolution firing plaintiff without pretermination hearing); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 252-53 (1981) (city

15

council canceled license for performance because of dispute over content).  However, not every decision by municipal officers subjects the municipality to liability.  *Pembaur*, 475 U.S. at 482.  The official must be responsible for establishing final government policy respecting such activity before the municipality can be held liable.  *Id.* at 482-83.  Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority.  *Id.* at 483.  A[M]unicipal liability under ' 1983 attaches whereCand only whereCa deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.@  *Id.*  That a particular officialCeven a policymaking officialChas discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on the exercise of that discretion.  *City of Houston v. Leach*, 819 S.W.2d 185, 199 (Tex. App.CHouston [14th Dist.] 1991, no writ) (citing *Pembaur*, 475 U.S. at 482-83).

Appellants insist that Sergeant Boydston, as the APD=s special-events supervisor, organized the plans to handle the President=s visit and the public=s reaction to it, including the APD=s treatment of appellants.  Boydston admitted that protest planning is all he does; appellants claim that makes him an official policymaker.  Likewise, they assert that Sergeant Dukes was delegated official authority from the City as the mounted unit=s commander, with A[s]upervision of the day to day operations of the Mounted Unit.@  Officer Carlson also was an official policymaker, they allege, because he had the sole responsibility for devising the mounted unit=s tactics.  Despite these allegations, appellants have cited no evidence in the record or Texas authority indicating that the exercise of these functions by these individual APD officers amounts to Apolicymaking authority.@  Even a county sheriff with discretion to hire and fire employees may

16

not be responsible for establishing the county=s official employment policy under the strict *Monell* requirement. *See Pembaur*, 475 U.S. at 482 n.12. Appellants have failed to present anything more than a mere assertion that the APD officers involved in the April 27 incident were responsible for establishing City policy on First-Amendment rights. We hold that there is no evidence to support appellants= assertion that the officers identified can be said to Adecide the goals for a particular city function and devise the means of achieving those goals@ or to Aact in place of the governing body.@ *Bennett*, 728 F.2d at 769.

Because appellants did not establish a fact issue on any element of their section 1983 claim, the City was entitled to judgment as a matter of law. We affirm the judgment of the trial court that directed a verdict in favor of the City on this claim.

**State constitutional claims**

Appellants= second issue asserts that the trial court improperly directed a verdict for the City on their state constitutional claims in equity, which sought an injunction, a declaratory judgment, and attorney=s fees. Appellants contend that such claims stand independently from the federal claims and that the enumerated *Monell* elements essential to a section 1983 claim are not required to support their allegation that the City violated their rights to free speech and assembly under the state constitution. *See City of Beaumont v. Bouillion*, 896 S.W.2d 143 (Tex. 1995).

*Bouillion* held that there is no implied private right of action for damages under the Texas Constitution when an individual alleges the violation of speech and assembly rights. *See id.* at 149. Appellants admitted at trial that they were not bringing a state constitutional tort but asserted that certain

17

common-law claims based on the state constitution survived *Bouillion*. The trial court disagreed and granted the City=s request for an instructed verdict. The trial court was correct that *Bouillion* eliminates state common-law claims as well as any private right of action for damages for violation of state free speech and assembly rights.

However, the trial court instructed a verdict on all of appellants=Astate constitutional claims,@ including its suit for injunctive and declaratory relief, as well as attorney=s fees. While holding that individuals have no cause of action for damages resulting from constitutional violations, *Bouillion* distinguished suits seeking equitable remedies: AOur review of the language of the Constitution leads us to conclude that there is no basis from the text of the Constitution to assume a party is given more than equitable protection.@ *See id.*; *see also Jones v. Memorial Hosp. Sys.*, 746 S.W.2d 891, 893 (Tex. App.CHouston [1st Dist.] 1988, no writ). Thus, the instructed verdict on all of appellants=state constitutional claims, including its equitable claims and its suit for declaratory judgment, granted more relief than the City was entitled to under *Bouillion*. Thus, appellants=state constitutional claims seeking injunctive and declaratory relief should have been determined by a jury if the evidence raised a fact issue as to those claims. *See Prudential*, 29 S.W.3d at 77.

## A. *Injunctive relief*

The City contends that the trial court properly directed a verdict for the City on the claim for injunctive relief because there was no evidence to support the necessary elements of an injunction: a wrongful act, the existence of imminent harm, the existence of irreparable injury, and the absence of an adequate remedy at law. *See Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d

841, 853 (Tex. App.—Austin 2002, no pet.).  The City then cites *Envoy Medical Systems, L.L.C. v. State*, 108 S.W.3d 333, 335 (Tex. App.—Austin 2003, no pet.) for the proposition that appellate review of a trial court=s order granting or denying a permanent injunction is strictly limited to a determination of whether the trial court has committed a clear abuse of discretion.  Although the City has cited the correct standard of review for the grant or denial of an injunction, we must review the record to determine whether the evidence was sufficient to raise a fact issue, *see Prudential*, 29 S.W.3d at 77, not whether the trial court abused its discretion, because the trial court did not deny appellants= injunction request but directed a verdict for the City.

Generally, the purpose of injunctive relief is to halt wrongful acts that are threatened or in the course of accomplishment, rather than to grant relief against past actionable wrongs or to prevent the commission of wrongs not imminently threatened.  *Texas Health Care Info. Council*, 94 S.W.3d at 853 (citing *Texas Employment Comm=n v. Martinez*, 545 S.W.2d 876, 877 (Tex. Civ. App.—El Paso 1976, no writ)).  AAn injunction will not lie to prevent an alleged threatened act, the commission of which is speculative and the injury from which is purely conjectural.@ *Markel v. World Flight, Inc.*, 938 S.W.2d 74, 80 (Tex. App.—San Antonio 1996, no writ), *quoted in Texas Health Care Info. Council*, 94 S.W.3d at 853.  Fear or apprehension of the possibility of injury is not sufficient.  *Frey v. DeCordova Bend Estates Owners Ass=n*, 647 S.W.2d 246, 248 (Tex. 1983).  Our review of the record indicates that the evidence was not sufficient to raise a fact issue on imminent harm.  Whether there is a threat of imminent harm is a legal determination resting with the court.  *Operation Rescue-Nat=l v. Planned Parenthood of Houston & Southeast Tex., Inc.*, 975 S.W.2d 546, 554 (Tex. 1998).

19

Appellants had the burden to present evidence that future use of the mounted-patrol Apolicy@ would result in imminent harm to other citizens seeking to express their free-speech and assembly rights. *See Christensen v. Integrity Ins. Co.*, 719 S.W.2d 161, 163 (Tex. 1986) (party seeking injunction has burden of showing that clear equity demands injunction); *Frey v. DeCordova Bend Estates Owners Ass=n*, 632 S.W.2d 877 (Tex. App.CFort Worth, 1982), *aff=d*, 647 S.W.2d 246 (Tex. 1983) (party seeking injunction has burden of proof on all four necessary showings). That the mounted-patrol Apolicy@ remains on the books is not enough to show imminent harm. The APD has not threatened to use the Apolicy@ against political protestors or appellants specifically. Although appellants assert that they are politically active and will continue to stage protests, they have not pointed to particular planned protests and coincident APD responses indicating that the protestors will be prevented from expressing themselves or assembling. Nor have they presented evidence that the APD will squelch their future speech because of its content or viewpoint. All of their claims supporting an injunction rely on past events and merely speculate that something similar might happen again. Appellants failed to sustain their burden of establishing imminent harm. Thus, the trial court properly directed a verdict for the City on appellants= claims for injunctive relief.

## B. Declaratory relief

The declaratory judgments act may be used to clarify constitutional imperatives. *See Frasier v. Yanes*, 9 S.W.3d 422, 427 (Tex. App.CAustin 1999, no pet.); *see also Hays County v. Hays County Water Planning P=ship*, 106 S.W.3d 349, 359 (Tex. App.CAustin 2003, no pet.) (party may bring declaratory-judgment action to determine whether commissioners court has acted outside of its constitutional and statutory authority). Although declaratory judgments are not purely legal or equitable in

20

nature, *see Texas Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970), they are not prohibited by *Bouillion=*s holding that there is no implied right of action for damages under the state constitution. They are more akin to the equitable relief afforded under the state constitution in *Jones v. Memorial Hospital Systems*, 746 S.W.2d 891, as affirmed in *Bouillion*. 896 S.W.2d at 149. Thus, a verdict should not have been directed on appellants= claims for declaratory relief if the evidence raised a fact issue that appellants= state constitutional rights were violated. *See Szcepanik*, 883 S.W.2d at 649.

A declaratory judgment will declare the rights, duties, or status of the parties only in an otherwise justiciable controversy, *Frasier*, 9 S.W.3d at 427. The justiciable controversy appellants present is whether the City violated their rights under the state constitution. *See Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 209 (Tex. 1981) (question of whether irreparable injury occurred when City refused to issue parade permits was not moot but active controversy despite fact that particular date and conditions under which applicants sought permit no longer existed). The Texas constitutional guarantees of freedom of speech and expression have been held to constitute an independent legal basis for a cause of action claiming an infringement of the right of free speech. *Jones*, 746 S.W.2d at 893. Additionally, if the underlying dispute between the parties is one Acapable of repetition, yet evading review,@ it is still properly before a court, despite the fact that the restraint upon free speech was short-lived and no longer exists. *Iranian Muslim Org.*, 615 S.W.2d at 209 (citing *Nebraska Press Ass=n v. Stuart*, 427 U.S. 539, 546 (1976)); *see also State v. Lodge*, 608 S.W.2d 910, 911-12 (Tex. 1980).

21

We thus turn to appellants= claim for declaratory relief that the City=s actions violated their free-speech rights under the Texas Constitution. We recognize that the supreme court has suggested that the Texas free-speech clause may be Abroader@ in some respects than its federal counterpart. *See Ex parte Tucci*, 859 S.W.2d 1, 5 (Tex. 1993); *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex. 1992). But, in its most recent free speech decisions, the court has held that unless a party can show through the text, history, and purpose of article I, section 8, that the state constitution affords more protections than the First Amendment in regard to that case, courts should assume that free speech protections are the same under both constitutions. *See Texas Dept. of Transp. v. Barber*, 111 S.W.3d 86, 106 (Tex. 2003) (after deciding case based on U.S. Constitution, court stated, AHere, Barber has not articulated any reasons based on the text, history, and purpose of Article I, section 8 to show that its protection of noncommercial speech is broader than that provided by the First Amendment under the circumstances presented.@); *Operation Rescue*, 975 S.W.2d at 559 (Tex. 1998) (AIt is possible that Article I, Section 8 may be more protective of speech in some instances than the First Amendment, but if it is, it must be because of the text, history, and purpose of the provision, not just simply *because*.@). Appellants have not articulated any reason why the Texas free speech clause would be more protective of their rights than the First Amendment. Accordingly, we will follow the familiar first-amendment jurisprudence in addressing their Texas free-speech claims.

As we have discussed above, the City=s crowd-control policies are not facially violative of the First Amendment. We thus consider only whether these policies, as applied against the appellants in this case, violated the First Amendment.

It is clear that A[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.@ *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).  But the First Amendment does not guarantee the right to communicate one=s views at all times and places or in any manner.  *Heffron*, 452 U.S. at 647.  Expression may be subject to reasonable time, place, and manner restrictions.  *Clark*, 468 U.S. at 293.  Thus, the United States Supreme Court has employed a two-tier approach in analyzing speech restrictions.  For the more restrictive tierCAregulations that suppress, disadvantage, or impose differential burdens upon speech because of its content@Cthe court applies Athe most exacting scrutiny.@ *Turner Broad. Sys., Inc. v. Federal Communications Comm=n*, 512 U.S. 622, 642 (1994).  Such content-based regulations are presumptively invalid, and they can withstand strict scrutiny only if precisely drawn to serve a compelling state interest.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *Consolidated Edison Co. of N.Y., Inc. v. Public Serv. Comm=n,* 447 U.S. 530, 540 (1980).  For the less restrictive tierCAregulations that are unrelated to the content of speech@Cthe Court applies an Aintermediate level of scrutiny.@ *Turner Broad. Sys., Inc.*, 512 U.S. at 642.  Such content-neutral regulations are valid provided they are narrowly tailored to serve a substantial governmental interest and do not unreasonably limit alternative channels for communicating the information.  *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986).

The first step in our analysis of the appellants= claim under the Texas free-speech clause must determine whether the restrictions placed on the protestors=free expression were content-based.  To be content-neutral, a restriction must be both viewpoint-neutral and subject-matter neutral.  *See Barber*, 111 S.W.3d at 93.  To be viewpoint-neutral, a regulation must not be based on the message=s ideology.

23

*Boos v. Barry*, 485 U.S. 312, 321 (1988). To be subject-matter neutral, a regulation must not be based on the speech=s topic. *Carey v. Brown*, 447 U.S. 455, 471 (1980). However, the Supreme Court has treated some content-based regulations as content-neutral if the regulations are motivated by a permissible content-neutral purpose. *See City of Renton*, 475 U.S. at 48 (court upheld ordinance disallowing adult theaters, concluding that ordinance was aimed not at content of films, but rather at Asecondary effects@Csuch as crime and deteriorating property valuesCthat such theaters caused).

In this case, the appellants have adduced evidence that some people who were supporters of President Bush were allowed to reach the free-speech area, while the protestors= access to the area was blocked. One protestor who reached the free-speech area by a circuitous route was allegedly asked by a police officer to roll up his sign protesting the President. In reviewing a directed verdict, we are required to view this evidence in the light most favorable to the appellants and disregard all contrary evidence and inferences. *Szcepanik*, 883 S.W.2d at 649. Applying this standard of review, there is evidence that the City was differentially applying its policies to pro-Bush versus anti-Bush demonstrators, Asorting out@ protestors so as to Asuppress, disadvantage, or impose differential burdens upon speech because of its content.@ *See Turner Broad. Sys., Inc.*, 512 U.S. at 642.

On the other hand, there is some evidence to support the City=s contentions that it was responding to an order from the secret service to prevent the appellant protestors from reaching the free-speech area. One might infer that such an order would have been motivated by presidential security concerns, but the record is vague on this point. And, while such an interest might be significant or even compelling, merely invoking it does not establish that the restriction is sufficiently tailored to serve that

24

interest or leaves open ample adequate alternative channels of communication. *See Operation Rescue*, 975 S.W.2d at 556 (record did not demonstrate that buffer zones against protestors was sufficiently tailored to protect privacy and property interests); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227-29 (9th Cir. 1990) (while asserted government interest in protecting officials from attack was significant, government did not show why seventy-five yard security zone imposed to protect officials from protestors was properly tailored to protect that interest or left open ample alternative channels for communication).

On the record before us, it is not even possible to discern if the City=s actions were content-neutral or content-based. If content-neutral, the City=s actions are to be measured against a standard of intermediate scrutiny that permits regulation of the time, place, and manner of expression if such regulation is narrowly tailored to serve a significant government purpose, so long as it leaves open ample alternative channels of communication. *Operation Rescue*, 975 S.W.2d at 556 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also City of Renton*, 475 U.S. at 48. If the restrictions imposed were based on the content of the protestors= message, they must survive a stricter scrutiny to pass constitutional muster: A[content-based restrictions] on speech in public forums are strictly scrutinized, and none is permitted by the First Amendment except as necessary to serve a compelling state interest and narrowly drawn to achieve that end.@ *Operation Rescue*, 975 S.W.2d at 556 (citing *Perry Educ. Ass=n v. Perry Local Educators=Ass=n*, 460 U.S. 37, 44-46 (1983)).

While this case arose amid the maelstrom of the contested presidential election in 2000, we must interpret and apply our constitutional protections of free expression in a manner transcending that

25

contentious debate.  As the Texas Supreme Court observed in addressing the constitutionality of speech

restrictions in the volatile context of the abortion debate:

> The voice seeking audience in this case is that of those who oppose abortion.  The conflict is with businesses and individuals who seek to provide abortion services in lawful ways and to enjoy their property and privacy interests as other citizens.  The district court was called upon to find the boundary between the two and prevent trespass by one side against the other.  That boundary cannot be determined by the subject matter of the dispute, nor can the personal sympathies of judges to one side or the other affect their duty to draw lines.  No one issue is entitled to greater access to the public forum than another.  AFreedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.@  The issue here is abortion; in the next case it will be different.  The rule of this case must be given application in the next.

*Operation Rescue*, 975 S.W.2d at 555-56 (internal citations omitted).

Based on this record and viewing the evidence in the light most favorable to the appellants

while disregarding all contrary evidence and inferences, *see Szcezepanik*, 883 S.W.2d at 649, we conclude

that the question of whether the City violated appellants= rights under the state constitution cannot be

decided as a matter of law.  We accordingly hold that the trial court erred in directing a verdict on

appellants= claim for declaratory relief under the state constitution.

## CONCLUSION

Because appellants did not establish a fact issue on any element of their section 1983 claim

for damages, we affirm the judgment of the trial court that directed a verdict in favor of the City on that

claim.  We also affirm the directed verdict denying injunctive relief under the state constitution because

appellants failed to establish imminent harm that would entitle them to an injunction.  However, we hold that

26

the trial court erred in granting a directed verdict on the appellants=claims for declaratory judgment that the City violated their free speech and right of assembly under the state constitution. We reverse that portion of the judgment and remand for further proceedings consistent with this opinion.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Pemberton: Opinion by Justice B. A. Smith; Concurring Opinion by Justice Patterson; Concurring Opinion by Justice Pemberton

Affirmed in Part; Reversed and Remanded in Part

Filed: July 15, 2004